**In the Matter of James MINGES, Debtor.**

**CONTROL DATA CORPORATION, Appellant,**

v.

**Steven ZELMAN, Trustee-Appellee.**

**No. 777, Docket 78–5051.**

United States Court of Appeals, Second Circuit.

Argued April 23, 1979.

Decided June 28, 1979.

John B. Nolan, Hartford, Conn. (Day, Berry & Howard, Allan B. Taylor, Hartford, Conn., of counsel), for appellant Control Data Corp.

Dwight Owen Schweitzer, Hartford, Conn., for trustee-appellee Steven Zelman.

Elliott B. Pollack, Hartford, Conn. (Hoberman, Pollack & Roseman, Howard L. Siegel, Hartford, Conn., of counsel), for Capital for Technology Corp.

Before WATERMAN, FEINBERG and MANSFIELD, Circuit Judges.

FEINBERG, Circuit Judge:

Control Data Corporation, lessee of space in an office building owned by James Minges, the debtor in a Chapter XII proceeding, appeals from an order of the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, J., permitting appellee Steven Zelman, the debtor's Chapter XII trustee, to reject certain covenants in the lease. The order of the district court affirmed an order of bankruptcy judge Saul Seidman. For reasons set forth below, we remand the case for further findings.

## I

So far as we can tell from the somewhat sketchy record before us, the following facts appear to be undisputed. Control Data Corporation, which we shall refer to as the lessee, is the successor in interest of Service Bureau Corporation, the original signatory to the lease with Minges for second floor office space in an office complex called Pro Park in Farmington, Connecticut. The lease provided for a 10-year term, commencing December 1, 1967, with an option in the tenant to extend in successive two-year terms for up to 10 more years. Under the lease, the landlord is obligated to furnish hot and cold water, heat, air-conditioning (including the necessary electricity) and janitorial services. The tenant pays utility charges only for lighting its office premises and for the office machines. These charges are separately metered and billed directly to the tenant by the utility company. The lease also gives the tenant a right of first refusal of all other space in the same building and the right to require the landlord to provide up to 16,000 square feet of additional space. The lessee uses the premises 24 hours a day, every day of the year, as a computer facility and service bureau operation. The lease also provides that it is subordinate to any mortgage but that the mortgage shall contain provisions that the mortgagee, in the event of foreclosure "will not attempt to terminate this lease . . . nor interfere with the rights of" the lessee, if the latter is not in default.

In October 1972, Capital for Technology Corporation (CTC) made a loan to Minges, which was secured by a second mortgage on Pro Park. CTC's parent, Hartford National Bank, also obtained a third mortgage on the property. A year later, CTC paid the arrearages on the first mortgage and exercised its right to take possession of Pro Park. CTC then began a foreclosure action in the state courts and obtained a judgment. Execution of that judgment, however, was stayed after Minges filed his Chapter XII petition in October 1974. The bankruptcy court has allowed CTC to remain as mortgagee in possession of Pro Park, managing the property and collecting the rents.

In September 1976, the Chapter XII trustee petitioned the bankruptcy court to allow him to reject certain portions of the lease as burdensome pursuant to section 413(1) of the Bankruptcy Act. These are the provisions that require the landlord to provide utilities and janitorial service, that grant the tenant the right of first refusal on space in the building that becomes vacant, and that allow the tenant to extend the lease on the original space for five additional two-year terms. According to the bankruptcy judge, there was evidence at the hearing that the value of the space rented under the lease has increased considerably since 1967 from $4.30 per square foot, the lease rate, to "$7.00 per foot or more." The bankruptcy judge also found that in 1967 a reasonably prudent landlord would have expected to spend each year about $7,000 on electricity and $3,000–$4,000 on janitorial service. In contrast, the landlord's annual cost of supplying these services to the lessee in 1975 was approximately $19,000 and $15,250 a year respectively.

After the hearing, the bankruptcy judge in a lengthy opinion granted the trustee's petition to reject the landlord's covenants to supply utilities and janitorial service as well as the tenant's right to additional space, but denied the petition with regard to the tenant's options to extend the term of the lease. Judge Blumenfeld, in a brief opinion, affirmed the decision of the bankruptcy judge. The trustee has not appealed from the portion of the ruling that was adverse to him, and the lessee apparently does not contest in this court the trustee's rejection of the lessee's right to first refusal on additional space. This appeal, therefore, concerns the trustee's rejection of the landlord's covenants to supply utilities and janitorial service.

## II

Appellant lessee argues to us that the bankruptcy judge applied the wrong legal standards in deciding whether to grant the

relief sought by the trustee. Thus, appellant argues that to justify rejection of the lease, or any part of it, the trustee had to show that the lease caused a net loss to the estate rather than merely insufficient profits, that rejection will serve the purpose of Chapter XII, and that rejection will benefit creditors other than CTC and its parent, which are secured by mortgages. None of these conditions, appellant says, was met.

■ Before assessing these arguments, the statutory scheme must be briefly reviewed. In proceedings initiated under various chapters of the Bankruptcy Act, the bankruptcy court may allow the trustee or debtor in possession to reject executory contracts of the debtor. Thus, the trustee or debtor, in the proper circumstances, may cancel pre-bankruptcy executory contracts of the debtor that are burdensome. See Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 447–50 (1973). When such rejection occurs, the other party to the rejected contract becomes a general creditor of the estate for any damages flowing from the rejection. See section 63a(9), c. See also 3A Collier on Bankruptcy ¶¶ 63.31, 63.35 (1975).[1]

■ Turning specifically to Chapter XII provisions, section 413(1) of the Act provides:

Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it—

(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate;

Section 406(4) of the Act defines "executory contracts" as including "unexpired leases of real property." Section 442 gives a Chapter XII trustee the powers of a bankruptcy trustee under section 44, and such a trustee, under section 70b must either assume or reject executory contracts "including an unexpired lease of real property." Therefore, there is no doubt that a Chapter XII trustee has the power, with the permission of the court, to reject a lease as an executory contract. See In re Freeman, 49 F.Supp. 163 (S.D.Ga.1943), questioned on other grounds, Matter of Garfinkle, 577 F.2d 901, 904 n. 4 (5th Cir. 1978). See also 9 Collier on Bankruptcy ¶ 3.03 (1978). Indeed, appellant does not take a contrary position.

■ Although leases are generally treated as executory contracts in the bankruptcy context, they raise some unique considerations, particularly in the relatively rare instance where it is a debtor landlord who seeks to reject the lease.[2] A lease is partly the conveyance of an estate, which is deemed fully executed once the tenant takes possession. Therefore, the weight of authority is that the conveyance aspect of a lease may not ordinarily be unilaterally disturbed by a debtor landlord or his trustee. See 9 Collier on Bankruptcy ¶ 3.03 at 799–800 (1978). See also Matter of Garfinkle, supra, 577 F.2d at 904 n. 4 (5th Circuit sharply criticizing In re Freeman, supra, 49 F.Supp. at 165, holding that a lessor's disaffirmance of a lease in a Chapter XII proceeding renders the lessee merely a tenant at sufferance); In re New York Investors Mutual Group, 153 F.Supp. 772, 775 (S.D.N.Y.1957) (Weinfeld, J.), aff'd sub nom., Cohen v. East Netherland Holding Co., 258 F.2d 14, 16 (2d Cir. 1958); Revised Bank-

---

1. The recent revision of the Bankruptcy Act, effective October 1, 1979, retains the power of a debtor-lessor, or its trustee, to reject executory contracts including unexpired leases. 11 U.S.C.A. § 365(a) (Supp.1979). However, under that revision, if the lessee remains in possession, as is contemplated here, the lessee may offset damages flowing from the rejection "against the rent reserved under such lease," and the lessee has no further rights against the lessor's estate. Id. § 365(h)(2). Our opinion today is predicated solely on the trustee's rejec-

tion power under the present Bankruptcy Act, and we intimate no views on what would happen on these facts under the revision.

2. See, e.g., Siegel, Landlord's Bankruptcy, A Proposal for Treatment of the Lease by Reference to Its Component Elements, 54 B.U.L.Rev. 903 (1974); Creedon and Zimmer, Landlord's Bankruptcy: Laissez Les Lessees, 26 Bus.Law. 1391 (1971). The author of the former article is one of the attorneys for CTC.

ruptcy Act, 11 U.S.C.A. § 365(a), (h) (Supp. 1979) (effective October 1, 1979). This view, that a lessee's possession may not be disturbed by the Chapter XII rejection power, may also be compelled by section 402 of the Act, which provides that the provisions of Chapters I to VII apply to Chapter XII where "not inconsistent" with it. Section 70b, part of Chapter VII, provides that

> Unless a lease of real property expressly otherwise provides, a rejection of the lease or of any covenant therein by the trustee of the lessor does not deprive the lessee of his estate.

The 5th Circuit apparently takes the position that this language is "not inconsistent" with Chapter XII. See *Garfinkle*, supra, 577 F.2d at 904 n. 4. In this case, the Chapter XII trustee is not seeking to disturb the lessee's possession.

Another nice question that arises with respect to unexpired leases is whether under the Bankruptcy Act they may be rejected in part, i.e., on a clause by clause basis, or only as a whole. Collier states generally that executory contracts must be either rejected or assumed as a whole. See, e.g., 4A Collier on Bankruptcy ¶ 70.42[1] at 500 (1978). But leases may be an exception, as the bankruptcy judge held in this case, since section 70b speaks of "rejection of the lease *or of any covenant therein . . . .*" (Emphasis added). But see 8 Collier on Bankruptcy ¶ 3.15[7] n. 28 (1978), where it is argued that the quoted language merely underscores that a lessee's estate may not be rejected, and that it does not provide support for rejection of only some of the executory portions of a lease. In any event, we need not decide the question whether rejection of only a few of the executory covenants of a lease is permissible since appellant does not challenge the rejection on that basis. On these facts, it is apparent that to the extent the lease is not rejected appellant is benefitted. With these special problems in mind, we turn to the general doctrines in bankruptcy concerning rejection of executory contracts, the framework within which we must work.

The Bankruptcy Act does not list any criteria for authorizing the rejection of an executory contract. As indicated above, section 413(1) of the Act merely provides that "the court may . . . permit" the trustee to do so. However, it is accepted that to justify rejecting an executory contract, it must at least be shown to be "burdensome," since the power to reject derives from the long held doctrine that the bankrupt estate may abandon burdensome property. See 4A Collier on Bankruptcy ¶ 70.43 (1978); Silverstein, Rejection of Executory Contracts, 31 U.Chi.L.Rev. 467, 468–72 (1964). Appellant argues that this condition is not met here because, as the bankruptcy judge pointed out:

> In the instant case, the debtor is not showing an actual net loss. It is rather showing a net return substantially less than it could obtain without the burden of providing services under the lease covenants.

According to appellant, citing *American Brake Shoe & Foundry Co. v. New York Rys. Co.*, 278 F. 842, 844 (S.D.N.Y.1922), for the proposition, an executory contract cannot be deemed "burdensome" so long as it produces a profit, and the possibility of greater profit is irrelevant. The bankruptcy judge rejected this view so that the issue is squarely posed on appeal.

In *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943), relied on by the bankruptcy judge, the Court was faced with the same argument also based on the *American Brake Shoe* case. While not explicitly rejecting the contention, the Court did approve rejection of a lease under which the debtor "received a net financial benefit," and concluded that

> the question whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment.

318 U.S. at 549–50, 63 S.Ct. at 743. Appellant stresses that *Institutional Investors* was a railroad reorganization and that the implications of the decision should be con-

fined to bankruptcy proceedings of comparable public interest.

We disagree. Even though the "business judgment" test has been most frequently applied in railroad reorganization cases, see *Silverstein*, supra, 31 U.Chi. L.Rev. at 480 n. 58, 500 n. 135 (1964) (citing cases), the test has not been confined to that context. See *Matter of Tilco, Inc.*, 558 F.2d 1369, 1372 (10th Cir. 1977); *King v. Baer*, 482 F.2d 552, 557–58 (10th Cir.), *cert. denied*, 414 U.S. 1068, 1131, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); 6 Collier on Bankruptcy ¶ 3.23[4] n. 31 (1978); *Countryman*, supra, 57 Minn.L.Rev. at 461 & n. 87. See also *In re New York Investors Mutual Group*, 143 F.Supp. 51, 56 (S.D.N.Y.1956) (Weinfeld, J.); *In re 1430 Equities, Inc.*, 4 Bankr.Ct. Dec. 806, 809 (B.J. S.D.N.Y.1978); *In re "K" Street Limited Partnership*, 16 Collier Bankr. Cases 8 (B.J. D.D.C.1978). Moreover, without explicitly using the "business judgment" terminology, a number of courts have employed the substance of that test in emphasizing potential greater profit for the debtor's estate in deciding whether to permit rejection of a particular contract. See *Matter of Jackson Brewing Co.*, 567 F.2d 618 (5th Cir. 1978); *In re Cheney Bros.*, 12 F.Supp. 605 (D.Conn.1935). Contra, *In re D. H. Overmyer Co., Inc.*, 1 Collier Bankr. Cases 516 (B.J. S.D.N.Y.1974). We believe that such a flexible test for determining when an executory contract may be rejected, however termed (and "business judgment" is as good a label as any), is most appropriate. For in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor. A rigid test, permitting rejection only where the executory contract will cause a net loss to the debtor's estate if performed, might work a substantial injustice in cases where it can be shown that the non-debtor contracting party will reap substantial benefits under the contract while the debtor's creditors are forced to make substantial compromises of their claims.

In this case, there is support in the record for a finding that the lease is burdensome.

The lessor's covenants to provide utilities and janitorial service consume what has come to be a very large portion of the rental income. Further, there is evidence in the record that the market rental value of the premises has almost doubled, although as indicated above, the trustee does not seek to reject the entire lease, including the relatively low rental figure. Thus, based on that evidence alone, it is not clearly erroneous to find the specific lease covenants at issue here burdensome, since the property is clearly capable of producing more income without them.

Appellant argues that to justify rejection of an executory contract, the trustee must show that doing so will "serve th[e] rehabilitative function of Chapter XII." By this, appellant apparently means that since Chapter XII is the analogue to Chapter X for individual debtors, see *In re Colonial Realty Investment Co.*, 516 F.2d 154, 157 (1st Cir. 1975), an executory contract cannot be rejected by a Chapter XII trustee unless this serves the purpose of putting "back into operation a going concern." *Baker v. Gold Seal Liquors*, 417 U.S. 467, 470, 94 S.Ct. 2504, 2506–07, 41 L.Ed.2d 243 (1974). This position is incorrect. To require that a trustee show that rejection of a particular contract will aid in the rehabilitation of the debtor would substantially undermine the rejection power under section 413(1). Under that section, the power may be exercised at any time, whether or not a plan has been prepared. Countryman, Executory Contracts in Bankruptcy: Part II, 58 Minn.L.Rev. 479, 553–56 (1974). Cf. *In re Cheney Bros.*, 12 F.Supp. 605 (D.Conn. 1935) (Section 77B). It may be too early to predict whether the Chapter XII proceeding will ultimately be successful in rehabilitating the debtor when the trustee is faced with the decision of which executory contracts will be assumed and which rejected. It is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate. Appellant rejoins that even that test was not met, and to that issue we now turn.

The bankruptcy judge found that:

It is obvious that relieving the debtor of the burdensome executive covenants re utilities and janitorial service will automatically enhance the value of the premises to the benefit of the ultimate beneficiaries, the creditors in Class 3 [the general creditors].

Appellant argues that there is no evidence in the record to support this statement, and that enhancement of the value of the premises would benefit only the secured creditors, CTC and its parent, and not the general creditors. To buttress its claim, appellant points out that the trustee's motion to reject the lease is being prosecuted solely by counsel for CTC, who purports to speak for both CTC and the trustee. And, finally, appellant urges the inequity of permitting the secured creditors to utilize the Chapter XII powers to improve their position over what it would be had they continued their foreclosure action in the state courts, where presumably they would be bound by the provisions in the lease not to "attempt to terminate" it and not to "interfere with the rights of" the lessee. See *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The trustee rejoins that the issue remains only one of sound business judgment and that it does not "matter who, secured or unsecured creditors, ultimately benefits from the rejection." *Matter of Jackson Brewing Co.,* supra, 567 F.2d at 621.

The parties thus lock horns on whether benefit to the secured creditors is enough, on these facts, to justify rejection of the lease covenants under the business judgment test. The disagreement, however, is irrelevant if there was a sound basis for the finding of the bankruptcy judge, quoted above, that the general creditors would benefit from the "enhance[d] . . . value of the premises." We are not satisfied that the record before us on the issue is adequate to decide this issue. We find only the most general estimate of increase in market value if the covenants involved here are rejected and no detailed support, by appraisal or otherwise, for this statement. Nor do we know the amount of the secured debt. Further relevant facts are whether the estate is likely to be adequate to cover administrative expenses and other priority claims, whether there are other properties beside Pro Park in the estate, and if there are, the extent of encumbrances on them. In short, we do not know whether a sound basis exists for a finding that there is a reasonable likelihood that general creditors will derive substantial or significant benefit from the proposed lease rejection. We therefore believe that the proceedings should be returned to the bankruptcy judge to make specific findings after giving the parties an opportunity to present further evidence. While we regret the further delay in the proceedings that a remand for this limited purpose will require, we believe that in the long run it will assist in a proper disposition of the remaining issues raised by the appeal.

Case remanded for further proceedings consistent with this opinion.

MANSFIELD, Circuit Judge (concurring):

I concur in Judge Feinberg's carefully considered opinion.

Where rehabilitation of the debtor is contemplated, I agree that a Chapter XII trustee should be governed by the "business judgment" standard in determining whether burdensome executory lease provisions should be rejected. At the same time, as Judge Feinberg indicates, the standard governing the trustee should be whether there is a reasonable likelihood that general creditors will derive any substantial or significant benefit. If, for instance, the rejection would probably result in no benefit to general creditors or in recovery of only a few dollars for distribution to general creditors holding claims of many thousands of dollars and would result in the mortgagees gaining a windfall at the expense of the lessee, the trustee should not have the power to reject. In the latter case he would in effect be acting as a pawn for the mortgagees, benefiting them at the expense of the lessee, even though the mortgagees took their security with notice of the burdens involved

(including the risk of higher utility costs), without any substantial resulting benefit to creditors generally.

As a representative of the bankruptcy court, which is a court of equity, the trustee should not play favorites between the lessee and secured creditors by manipulating the obligations affecting them, absent some significant benefit to the creditors generally. To do so would be inequitable. Although rejection of onerous lease obligations would increase the value of the mortgagees' security, thereby reducing the size of any portion of their claims that could not be satisfied out of the security, it would simultaneously generate claims by the lessee against the estate for loss of his rejected executory rights.

In the present case all parties, including Bankruptcy Judge Saul Seidman, agree that the debtor is in liquidation, having long since lost any hope of rehabilitation.[1] Counsel for the Trustee and the second mortgagee, Capital for Technology Corp., estimated that rejection of the Professional Park lease might increase the value of the property "by approximately $200,000.00," and that "[a]s a result, there might be sufficient equity in the Professional Park property to pay the second mortgage indebtedness held by Capital for Technology Corp. in full and to provide additional funds to satisfy the third mortgage indebtedness to Hartford National Bank and Trust Company." See "Appellees Supplementary Memorandum in Support of Bankruptcy Court's Order Re: Rejection of Executory Lease Covenants as to Control Data Corporation" dated January 17, 1978. However, they refuse to give any opinion as to whether rejection would result in any overage at all for general creditors other than to say it would "enhance the possibility of recovery." I do not think this is enough to justify rejection.

Accordingly, although I agree that a remand for the limited purposes of obtaining more specific findings on the issue of whether the general creditors would benefit from the rejection is appropriate, I would not favor rejection except upon a showing that it would result in some substantial or significant benefit to the creditors generally.

---

1. This conclusion is implicit in Bankruptcy Judge Seidman's memorandum opinion granting the motion to reject the lease covenants (at p. 12), where he refers to the arrangement providing for distribution of surplus proceeds following complete liquidation of the bankrupt's property. The same plan was referred to by the Trustee's attorney during the hearing before Judge Blumenfeld (tr. at p. 34). Appellee's supplementary memorandum in support of the Bankruptcy Court's order, filed in the district court, observes (at p. 4) that the proceeding in the bankruptcy court has been a gradual liquidation of the debtor's assets.