**In re LAFAYETTE RADIO ELECTRON-ICS CORPORATION et al., Debtor.**

**Bankruptcy No. 880–00042.**

United States Bankruptcy Court,
E. D. New York.

Jan. 26, 1981.

See also, Bkrtcy., 8 B.R. 973; 7 B.R. 187; 7 B.R. 189.

Levin & Weintraub, New York City, for debtor.

Noel Hauser, New York City, for Interstate Cigar Co.

Jaspan, Kaplan, Levin & Daniels, Garden City, N. Y., for Vanderbilt Associates.

## DECISION

C. ALBERT PARENTE, Bankruptcy Judge.

This is a consolidated decision resolving the issues raised by: (1) an order to show cause filed by Lafayette Radio Electronics Corporation on May 13, 1980, seeking authority to assume an unexpired lease and to sublease the premises; (2) an order to show cause filed by Interstate Cigar Co., Inc. on September 4, 1980, seeking an order permitting it to intervene as a matter of right in the proceedings commenced on May 13, 1980; and (3) a motion by Lafayette Radio

Electronics Corporation filed on September 23, 1980, seeking the Court's approval of a stipulation of settlement between Lafayette Radio Electronics Corporation and Vanderbilt Associates.

A summary of the pertinent facts elicited at the hearings held on June 23, 1980, and September 30, 1980, follows.

Lafayette Radio Electronics Corporation, Lafayette Radio Electronics Operating Corporation and five affiliated corporations (hereafter "debtor") filed petitions in bankruptcy under Chapter 11 of the Bankruptcy Code on January 4, 1980. Said proceedings have been consolidated for administrative purposes only.

Prior to the commencement of these reorganization proceedings, the debtor commenced the closing of several of its retail outlets. After the filing of the Chapter 11 petitions, the debtor continued this practice, which culminated in the closing of a substantial number of its retail outlets. A significant number of the closed retail outlets are leased to the debtor pursuant to agreements which permit the debtor to sublease the store premises.

During the pendency of the Chapter 11 proceedings, the debtor commenced a program of subleasing the closed store premises at rentals in excess of the lease rentals set forth in the prime leases between the various landlords and the debtor.

Pursuant to this subleasing program, the debtor filed an order to show cause on May 13, 1980, seeking an order (1) authorizing the debtor to assume the lease (hereafter "prime lease") between the debtor and Vanderbilt Associates (hereafter "landlord") of a warehouse located at 150 Engineers Road, Hauppauge, New York (hereafter "Location 3"); (2) authorizing the debtor to enter into a sublease arrangement with Interstate Cigar Company, Inc. (hereafter "ICC"); and (3) approving the sublease pursuant to 11 U.S.C. § 365.

The landlord filed an affidavit in opposition to debtor's request for relief and a hearing was held on June 23, 1980.

At said hearing, Robert Crimmins, director of the debtor's real estate division, testified that it would be in the best interests of the Chapter 11 proceeding to permit the debtor to assume the prime lease and sublease the premises to ICC. Under the prime lease, the debtor is obligated to the landlord for rent in the sum of $140,990 per year and taxes in the sum of $36,000 per year. Further, Crimmins admitted that the debtor is in default under the prime lease, but only with respect to the payment of taxes in the sum of $18,000.

Under the sublease, executed by the debtor and ICC on June 5, 1980, 88 percent of the warehouse space situated at Location 3 would be subleased to ICC at a yearly rental of $230,000. Therefore, a net benefit of $53,000 per year would be realized by the debtor if it was permitted to assume the prime lease and sublease the premises to ICC.

However, the net benefit to the debtor from the assumption of the prime lease and the sublease of the premises to ICC must be considered in light of the following facts.

First: From the net profit to the debtor, brokerage commissions in the sum of $59,000 must be deducted. The debtor has entered into an agreement with United Realty, the broker who introduced ICC to the debtor, whereby the brokerage commission will be paid in installments during the first fourteen months of the sublease.

Second: The debtor will incur the sum of $30,000 in construction expenses once the debtor is authorized to enter into a sublease arrangement with ICC and the Court has approved said sublease. This cost will be incurred by the debtor to subdivide the warehouse space so as to separate the 88 percent of the premises subleased to ICC from the 12 percent to be retained by the debtor for its own use.

The landlord opposes the debtor's application, asserting that:

(1) The granting of a security interest in the debtor's leasehold interest by the debtor to its secured creditors constitutes a default under the prime lease. Crimmins testified

that the assignment of the debtor's interest under the prime lease was executed without the consent of the landlord.

(2) The Court should not permit the debtor to assume the prime lease and sublease the premises to ICC based on equitable considerations. Paragraph 7 of the prime lease mandates that if the tenant (debtor) subleases more than 90 percent of the premises, any excess rent received by the debtor, i. e., the difference between the rent to be paid to the tenant by the subtenant and the tenant's rent obligation under the prime lease, is to be divided between the debtor and the landlord. Further, the landlord contends, and the testimony of Howard Kurfist, President of Island Realty, supports this contention, that the fair market value for Location 3 substantially exceeds the debtor's rental obligation under the prime lease. Thus, to allow the debtor to assume the prime lease would be inequitable. Crimmins testified that the main purpose for subleasing only 88 percent of the premises to ICC was to avoid the provisions of paragraph 7 of the prime lease. The landlord contends that such a result is inequitable.

(3) The debtor's application fails to provide for adequate assurance of future performance by the debtor under the prime lease.

The Court reserved decision on the debtor's application of June 23, 1980. Subsequent to June 23, 1980, the debtor and the landlord entered into settlement negotiations in an attempt to resolve the disputed issues.

On September 4, 1980, ICC moved for an order permitting it to intervene in these proceedings pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure (hereafter "FRCP"). ICC sought leave to intervene herein to urge the Court to disapprove any application by the debtor and the landlord to settle this action by permitting the debtor to reject the prime lease and to urge the Court to approve the sublease entered into between the debtor and the subtenant.

By notice of motion filed on September 23, 1980, the debtor moved for an order approving the settlement reached by the debtor and the landlord whereby the debtor will reject the prime lease pursuant to 11 U.S.C. § 365 in consideration of the landlord waiving all of its claims against the debtor and the payment of $764,000, payable in 120 monthly installments, to the debtor.

At the hearing held on September 30, 1980, the Court reserved decision on ICC's motion to intervene and the debtor's application for approval of the settlement between the landlord and the debtor.

The above finding of facts gives rise to the following issues:

(1) Does ICC have a sufficient interest in these proceedings to permit it to intervene as as matter of right pursuant to FRCP 24(a).

(2) Has the debtor established a sufficient basis to permit the rejection of the prime lease.

I.

Intervention as a matter of right is governed by Rule 24(a) of FRCP, which provides in relevant part:

Upon timely application anyone shall be permitted to intervene in an action: ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The collective requirements for intervention as of right may be enumerated as follows: (1) the applicant must have an interest in the property or transaction which is the subject of the action; (2) the applicant's ability to protect such interest may be impeded by any disposition of the action in his absence; and (3) the applicant's interest must not be adequately represented by the existing parties to the action. *In re Oceana International Inc.,* 49 F.R.D. 329 (S.D.N.Y.1969); *Vazman, S. A. v. Fidelity International Bank,* 418 F.Supp. 1084 (S.D.N.Y.1976).

Although the nature of an "interest" sufficient to support intervention of right has yet to be precisely determined, *Vazman, S. A. v. Fidelity International Bank, supra; In re Penn Central Commercial Paper Litigation,* 62 F.R.D. 341 (S.D.N.Y.1974), aff'd 515 F.2d 505 (2nd Cir. 1975), an analysis of the cases on this subject reveals certain guidelines.

■ First: The interest sought to be enforced by the intervening party must be a present, direct and substantial interest as distinguished from a contingent interest or mere expectation. *In re Penn Central Commercial Paper Litigation, supra; U. S. v. Carrols Dev. Corp.,* 454 F.Supp. 1215 (N.D.N.Y.1978). In the case at bar, ICC seeks to intervene in these proceedings so as to urge the assumption by debtor of the lease between the debtor and the landlord and to dissuade the Court from permitting the debtor to reject said lease. As stated by ICC in its application in support of its order to show cause and paragraph 1 of the proposed sublease, ICC's rights under the sublease are contingent upon the Court's approval of the sublease.

■ However, the Court cannot approve the sublease until it authorizes the debtor to assume the lease between the landlord and the debtor. Therefore, the interest sought to be enforced by ICC is contingent upon the following factors: (1) that the debtor will seek to assume the lease between the landlord and the debtor; (2) the Court will permit the debtor to assume said lease; and (3) the Court will authorize the debtor to enter into the sublease with ICC. ICC's interest thus is insufficient to warrant intervention.

■ Second: An interest to satisfy the requirements of Rule 24(a)(2) must be based on a right which belongs to the proposed intervenor rather than to an existing party to the proceedings. *In re Penn Central Commercial Paper Litigation, supra; Vazman, S. A. v. Fidelity International Bank, supra.* In the case at bar, ICC is attempting to intervene in these proceedings for the purpose of obtaining an order approving the sublease and enjoining the termination of the lease between the debtor and the landlord. Subject to Court approval, only the debtor has the right to determine if it will assume or reject an executory contract. 11 U.S.C. § 365. The only affirmative action permitted to a party other than the debtor is to request the Court to set a date by when the debtor must either assume or reject the executory contract. 11 U.S.C. § 365. Therefore, the interest sought to be enforced by ICC in this proceeding is an interest which does not belong to ICC but rather belongs to the debtor.

The cases cited by ICC in its post-trial memorandum do not support ICC's contention that it has a sufficient interest to permit intervention as a matter of right pursuant to Rule 24(a) FRCP. In each of the cases cited by ICC, the tenant or lessor who sought to intervene in a pending action was a party to an enforceable lease. *See: U. S. v. Dixwell Housing Development,* 71 F.R.D. 558 (D.Conn.1976); *FDIC v. Engle,* 524 F.2d 1339 (9th Cir. 1975).

■ In the case at bar, the sublease is not an enforceable agreement. A condition precedent is defined as an act or event which must exist or occur before a duty of immediate performance of a promise arises. *In re Georg Jensen, Inc.,* 1 B.R. 239 (S.D.N.Y.1979); *Boro Motors Corp. v. Century Motors Sales Corp.,* 18 Misc.2d 1009, 187 N.Y. S.2d 490 (Kings County, 1959). Until a condition precedent has been satisfied, there is no enforceable relationship between the parties. *Statement, Inc. v. Pilgrim's Landing, Inc.,* 370 N.Y.S.2d 970, 49 A.D.2d 28 (4th Dept. 1975).

■ Since the condition precedent in this case, *i. e.,* approval of the sublease by the Court, has not been satisfied, there is no enforceable relationship between ICC and the debtor. Therefore, the cases cited by ICC are inapplicable.

■ While a debtor has the power to enter into a contract which includes a condition precedent, the contract has no validity until approved by the Court. *In re Avorn Dress Co.,* 79 F.2d 337 (2nd Cir. 1935); *In re*

*Whitman Center, Inc.,* 285 F.Supp. 199 (C.D.Calif.1968); *In re Tru-Knit Industries, Inc.,* 9 CBC 415 (E.D.Pa.1976). Therefore, since the Court has not approved the sublease, said agreement is ineffective rendering ICC's interest insufficient to support intervention as a matter of right under Rule 24(a) FRCP.

Premised on the Court's finding that ICC has an insufficient interest to permit intervention as a matter of right, it is unnecessary to determine whether ICC's ability to protect its interest may be impeded by any disposition of the action in his absence or whether ICC's interest is adequately represented by the existing parties to the action.

## II.

█ The debtor's right to assume or reject an executory contract is governed by 11 U.S.C. § 365. While § 365 enumerates the requirements the debtor must satisfy before the Court can permit the debtor to assume an executory contract, § 365 does not codify any standards for the rejection of an executory contract. 11 U.S.C. § 365; 2 Collier on Bankruptcy (15th Ed.) ¶ 365.03. Therefore, the Bankruptcy Code leaves to the courts the task of formulating standards for rejection. 2 Collier on Bankruptcy (15th Ed.) ¶ 365.03.

█ The courts have developed several standards in determining if an executory contract should be rejected under the Bankruptcy Act. One standard has been whether the executory contract is burdensome to the debtor. *In re D. H. Overmyer Co., Inc.,* 1 CBC 516 (S.D.N.Y.1974); *In re Vidicom Systems, Inc.,* 7 CBC 568 (S.D.N.Y. 1975). To satisfy the "onerous and burdensome" test, the debtor must demonstrate that the executory contract creates a drain on the debtor's assets by *requiring the outlay of funds for an obsolete purpose. In re Vidicom Systems, Inc., supra.*

█ A second standard developed by the courts is the "business judgment" test. *In re Minges,* 602 F.2d 38 (2nd Cir. 1979); *In re New York Investors Mutual Group,* 143 F.Supp. 51 (S.D.N.Y.1956); *Group of*

*Inst. Investors v. Chicago, M., St. P. & P. R. Co.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943). Under the "business judgment" test, the debtor need only demonstrate that the rejection of the executory contract will benefit the estate. *In re Minges, supra; Local Joint Exec. Bd., AFL–CIO v. Hotel Circle Inc.,* 419 F.Supp. 778 (S.D.Calif.1976), aff'd 613 F.2d 210 (9th Cir. 1977).

█ In this case, the debtor seeks authority to reject the prime lease predicated on the "business judgment" test. The Court finds that the debtor has amply demonstrated that rejection of the prime lease will benefit the estate for the following grounds.

First: Pursuant to the settlement executed by the debtor and the landlord, if the debtor is permitted to reject the prime lease, the landlord will (a) waive all pre-petition and post-petition claims, in the sum of $80,000, against the debtor under the prime lease, and (b) remit the sum of $764,000, payable in 120 monthly installments, to the debtor. This consideration exceeds the sums the debtor would have received if the debtor was permitted to assume the prime lease and sublease the premises to ICC. Constant with the terms of the sublease, the debtor would receive a net cash flow of approximately $54,000 per year.

However, this sum must be considered in light of the following expenses which would be incurred by the debtor if it were to assume the prime lease: (1) construction expenses in excess of $30,000; (2) the curing of defaults under the prime lease which amount to $80,000 (post-petition and pre-petition claims); and (3) brokerage commissions in the sum of $59,000 which are to be paid during the first fourteen months of the sublease.

Further, a substantial question was raised by the landlord at the June 23, 1980, hearing as to whether in fact the debtor would be entitled to the full amount of the profit derived from the sublease given the provisions of paragraph 7 of the prime lease.

Second: Assuming the Court does not permit the debtor to reject the prime lease and the debtor is required to renew its application to assume the prime lease, then the debtor will face substantial business and economic risks. If the debtor rejects the prime lease pursuant to the settlement reached by the debtor and the landlord, the debtor is guaranteed a substantial sum of money. If the debtor is not permitted to reject the prime lease and moves to assume the prime lease, a significant degree of uncertainty results, given: (1) a substantial possibility that the debtor will not be permitted to assume the prime lease predicated on the landlord's opposition on equitable considerations and allegations that the prime lease may not be effective between the parties, and (2) even if the Court permits the debtor to assume the prime lease, the debtor faces protracted litigation on the appellate level.

Further, the only opposition to the debtor's request to reject the prime lease was filed by ICC. ICC does not dispute the application of the "business judgment" test to the case at bar. Rather, ICC contends that: (1) the Court must give consideration to all of the parties to the proceedings; (2) the debtor has no inherent right to avoid bona fide transactions which occur after the commencement of the bankruptcy proceeding and to permit rejection of the prime lease would prejudice ICC; (3) ICC is willing and able to provide adequate assurance that it will meet the future obligations under the sublease; (4) the need for a full evidentiary hearing to determine whether the settlement entered into by the debtor and the landlord is more advantageous than the assumption of the prime lease; and (5) approval of the settlement will increase the outstanding liabilities of the debtor's estate.

■ The Court finds that ICC's contentions do not constitute a basis for denying the debtor's request to reject the prime lease.

ICC's contention that the Court must give consideration to all of the parties to this proceeding is without legal significance. As discussed previously, ICC does not have a sufficient interest to intervene into this proceeding under Rule 24(a) FRCP. Therefore, the only parties to this proceeding are the debtor and the landlord, both of whom agree to the debtor's application to reject the prime lease.

■ Assuming ICC was a proper party to this proceeding, ICC's contention that the debtor does not have an inherent right to avoid contracts entered into after the filing of the Chapter 11 petition is not an accurate statement of the law. It is a well established principle of law that any lease or contract executed by a trustee in bankruptcy or a debtor without court authority is invalid. *In re Tru-Knit Industries, Inc., supra; In re Avorn Dress Co., supra.* Therefore, a lease entered into by the debtor without approval by the Court cannot be considered a bona fide and enforceable transaction. *In re Tru-Knit Industries, Inc., supra.*

■ The fact that ICC will be seriously prejudiced if the debtor rejects the prime lease does not constitute a sufficient basis to deny the debtor's request. Parties entering into contracts with a debtor act at their peril and face the possibility that the bankruptcy court will not recognize any contract executed by the parties without prior approval by the Court. *In re Avorn Dress Co., supra.*

■ Further, whatever prejudice will accrue to ICC could have been mitigated by ICC. ICC admitted at the hearing held on September 30, 1980, that it knew the sublease executed by the debtor and ICC would not become effective unless it was approved by this Court. Yet, ICC did not attempt to find alternative warehouse space which could be used in the event the Court did not approve the sublease. Moreover, once the Court permits the debtor to reject the prime lease, ICC is free to enter into negotiations directly with the landlord with respect to leasing the warehouse space. Finally, ICC may file a proof of claim in this Court for any damages resulting from the debtor's rejection of the prime lease.

With respect to ICC's contention that it is willing and able to provide adequate assurance that it will meet the future obligations under the sublease, such promises of assurance are irrelevant as to the question of whether the debtor should be permitted to reject the prime lease. ICC's ability to perform under the provisions of the sublease would become relevant only if the debtor were authorized by the Court to assume the prime lease. 11 U.S.C. § 365.

A full evidentiary hearing is not required in all instances to determine whether a settlement should be approved so long as the record is sufficient for the Court to render a determination. *In re Flah's Inc.*, 17 CBC 774 (N.D.N.Y.1978). The Court finds that a full evidentiary hearing is not required. The record of the hearing held on June 23, 1980, is sufficient with respect to the contentions of the debtor and the landlord as to the assumption of the prime lease and the provisions of the sublease. The contentions of ICC with respect to its motion to intervene in these proceedings and the provisions of the settlement entered into by the debtor and landlord were clearly enunciated in the record of the September 30, 1980, hearing.

Appositely, it is not certain that the debtor will incur greater liability by rejection of the prime lease. The extent of ICC's damages resulting from the debtor's rejection of the prime lease, if any, are speculative. However, it is certain that if the debtor was permitted to assume the prime lease and sublease the premises to ICC, the debtor would implicitly incur liabilities in excess of $160,000 (landlord's pre-petition and post-petition claims, $80,000; construction expenses, $30,000; and brokerage commissions, $59,000).

## CONCLUSION

Premised on the foregoing principles of law and equity, the Court finds that ICC's motion to intervene is denied and the debtor's application to approve the settlement entered into by the debtor and the landlord is hereby granted.

Settle judgment.