**In re F.W. RESTAURANT ASSOCIATES, INC., Debtor.**

**Bankruptcy No. 94–51171.
Doc. I.D. No. 18.**

United States Bankruptcy Court,
D. Connecticut.

Oct. 19, 1995.

David A. Greenberg, Trager and Trager, Fairfield, CT, for debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR APPROVAL OF ASSUMPTION OF CONCESSION AGREEMENT

ALBERT S. DABROWSKI, Bankruptcy Judge.

F.W. Restaurant Associates, Inc., Debtor and Debtor-in-Possession (hereinafter variously referred to as the "Debtor" or "Debtor-in-Possession") has made a motion pursuant to 11 U.S.C. § 365(a) to assume an executory contract or unexpired lease entitled "Fairchild Wheeler Golf Course Concession Agreement". After hearing the evidence adduced and arguments proffered by the Debtor-in-Possession and the Respondent/Objector the City of Bridgeport (hereinafter, the "City"), the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On May 6, 1994, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor has continued in the management and the operation of its business, and remained in possession of its property as a debtor-in-possession pursuant to 11 U.S.C §§ 1101(1), 1107 and 1108.

2. The Debtor operates a restaurant and snack bar business known as "Soundview" at the Fairchild Wheeler Golf Course (hereinafter, the "Golf Course"), a 36–hole golf course owned and operated by the City, but situated in the Town of Fairfield, Connecticut.

3. In the Spring of 1988, the City issued an Invitation to Bid which solicited bids from the public for a restaurant/snack bar concession at the Golf Course. The Invitation to Bid provided that the successful bidder "shall

supply all equipment and accessories for kitchen, bar, dining rooms, grill room, etc., including paint, silverware, tables, chairs, dishes, drapes, rugs, and whatever is necessary for establishment and operation of a First Class Restaurant ..." and "shall also provide duct work for heating and air conditioning throughout the kitchen and entire dining areas and bar ..." (the expenses for the foregoing items are hereinafter referred to as the "Initial Investment Expenses").

4. In response to the Invitation to Bid, the Debtor, or its predecessor(s) in interest, submitted a Bid Proposal to the City.

5. The Debtor, or its predecessor(s) in interest, was eventually selected by the City as the successful bidder for the restaurant/snack bar concession.

6. On or about February 7, 1989, the Board of Park Commissioners of the City (hereafter, the "Parks Board") entered into an agreement with the Debtor, or its predecessor in interest, entitled "Fairchild Wheeler Golf Course Concession Agreement" (hereinafter, the "Concession Agreement") through which the Parks Board agreed to permit the Debtor, and/or its predecessor(s) in interest, to operate a restaurant and snack bar facility at the Golf Course in an existing clubhouse structure (hereinafter, the "Premises"), which was undergoing renovation by the City.

7. The Concession Agreement had an initial term of five years commencing January 1, 1989, and ending on December 31, 1993. The Debtor had an "option of first refusal to renew" the Concession Agreement for two additional five-year terms, the first of which would commence January 1, 1994, and end December 31, 1998.

8. Paragraph 14 of the Concession Agreement provides for an annual concession fee to be paid by the Debtor to the City in the amount of $43,200, payable in installments of $3,600 per month (hereinafter, the "Monthly Concession Fees"), and further provides that "the monthly payments shall be offset by the amount of the concessionaire's initial investment as set forth in its bid proposal. Once the total of the monthly payments equals the amount of the investment the concessionaire shall make one adjusted monthly payment, if necessary, and then shall pay $3,600.00 per month through the end of the first renewal term."

9. The Debtor's Bid Proposal projected Initial Investment Expenses of $259,200. Thus, in entering into the Concession Agreement the City had, or should have had, a reasonable expectation that the Debtor's Initial Investment Expenditures could aggregate to a total of $259,200, and accordingly, the full monthly concession fee could be offset for as much as seventy-one (71) months.

10. Paragraph 16 of the Concession Agreement provides that upon termination of the Concession Agreement by expiration or prior cancellation, "all equipment and furnishings shall become the property of the Parks Board."

11. Under the terms of the Concession Agreement, the Debtor was to provide "a performance and payment bond" in favor of the City.

12. The Debtor has not posted, and currently refuses to post, a performance and payment bond in favor of the City.

13. Pursuant to Paragraph 10 of the Concession Agreement the Parks Board had the right to inspect the Debtor's financial records quarterly, but did not do so until 1991, and then again during the Fall of 1993.

14. As of January 21, 1992, the Parks Board, through Director of Parks and Recreation Phillip Handy, acknowledged that the Debtor's Initial Investment Expenses totalled $186,000.

15. The Parks Board did not dispute any of the Debtor's claimed Initial Investment Expenses until the Fall of 1993, i.e. over five years after the expenditures began to be incurred.

16. The Debtor-in-Possession has presented evidence that it, or its predecessor(s) in interest, incurred Initial Investment Expenses of at least $211,695.87.

17. The Debtor-in-Possession presented evidence that subsequent to the execution of the Concession Agreement, Mr. George Seamon, a member of the Parks Board Golf Committee, represented to the Debtor that

the Parks Board would waive $2,600 of the Monthly Concession Fee for each of the ten months of January through October of 1989, for a total of $26,000.00, because (i) the restaurant portion of the Premises had not been completed by the City and (ii) the Parks Board did not obtain the final Certificate of Occupancy from the Town of Fairfield until July, 1989; but such waiver was premised on the condition that the Debtor install railings inside and outside of the Premises, and a rock garden outside the Premises. The Debtor reasonably believed that Mr. Seamon was authorized to effectuate such a waiver and reasonably relied upon Mr. Seamon's representation in performing the additional work.

18. The Debtor-in-Possession concedes that neither it nor the Debtor has paid any Monthly Concession Fees to the City. It claims that such failure does not constitute a default under the Concession Agreement because all Monthly Concession Fees that have come due either (a) were waived by the City through Mr. Seamon or (b) are legitimately offset by (i) Initial Investment Expenses and (ii) damages to the Debtor's business caused by the acts and omissions of the City.

19. The Debtor claims that it has been damaged through one or more of the following alleged City acts or omissions: (a) an increase in non-resident greens fees; (b) a change in the playing order of golf holes on the "Black Course"; (c) failure to furnish adequate lighting; (d) untimely snow plowing; (e) erection of a pedestrian safety fence in the area of the pro shop and restaurant; (f) placement of handicap parking; and (g) overall lack of maintenance of the Golf Course and its attendant facilities (hereinafter referred to as the "Damages").

20. The Parks Board has increased fees for non-residents to play the Golf Course each year during the period 1989 through 1994. However, the Concession Agreement contains no provision stipulating greens fees for the Golf Course.

21. In 1991, the Parks Board reconfigured the Black Course by moving the first tee from its historical location directly in front of the Premises to a location more remote from the Premises. This reconfiguration also moved the 18th hole closer to the Premises.

22. The Concession Agreement contains no provision concerning the design and layout of the golf course, and no credible evidence was adduced by the Debtor to establish a business loss due to the reconfiguration of holes on the Golf Course.

23. Paragraph 5 of the Concession Agreement provides that "[t]he Parks Board will be responsible for operations outside the restaurant complex including, but not limited to, lighting, parking areas, walk paths, snow plowing."

24. The Debtor-in-Possession presented evidence that the Parks Board has failed to provide adequate lighting for the perimeter of the Premises and the parking areas, but no evidence was adduced to establish the quantity of business loss, if any, caused by lack of adequate lighting.

25. The Debtor-in-Possession presented evidence that the Parks Board has failed to provide adequate snow removal in the winter months for the parking and walking areas adjacent to the Premises. The City has an established order of snow plowing which it claims must be followed to protect its citizens. It plows first those roads leading to hospitals; next, main traffic arteries; then secondary roads; and last, parks and recreational facilities.

26. The placement of handicap parking at the Golf Course was dictated by officials of the Town of Fairfield. Therefore, no City conduct caused the Debtor to sustain damages, if any, because of the location of handicap parking.

27. In general, the Debtor-in-Possession has failed to offer any credible evidence which would assist the Court in assessing the Debtor's claimed loss of patronage and the amount of damages, if any, sustained.

## CONCLUSIONS OF LAW

1. The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear

and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A).

2. The resolution of this contested matter is governed by Bankruptcy Code Section 365. That Section provides in relevant part as follows:

(a) Except as provided in ... subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract ... of the debtor, the trustee may not assume such contract ... unless, at the time of assumption of such contract ..., the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract ..., for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract....

■ 3. The Concession Agreement is an "executory contract" within the meaning of Section 365(a). The Concession Agreement is not an unexpired lease of nonresidential real property, and therefore, was not deemed rejected sixty (60) days after the date of the order for relief. 11 U.S.C. § 365(d)(2), (4). Although the Concession Agreement's initial term expired December 31, 1993, its optional terms, extending through at least December

31, 1998, are eligible for assumption under Section 365(a).

■ 4. Under a strict Section 365(b)(1) analysis, the City bears the evidentiary burden of establishing the Debtor's default under the Concession Agreement. If that burden is met, the Debtor-in-Possession then bears the burden of proof on the issues of prompt cure and adequate assurance of future performance, *inter alia.*

■ 5. The City has established to this Court's satisfaction the existence of a monetary default under the Concession Agreement in the amount of $27,104.13 as of the date of the hearing on this matter.[1] This default amount is calculated by taking the total unpaid Monthly Concession Fees through January 1995 ($264,800) and crediting against such fees (a) $211,695.87 in Initial Investment Expenses and (b) $26,000 in Monthly Concession Fees waived by the City through Mr. George Seamon. Implicit in this calculation is the Court's conclusion that the Debtor has failed to carry its burden of establishing the existence and extent of the Damages. Therefore, the Debtor has not been credited with any Damage offset against its present monetary default and/or future performance obligations.[2]

■ 6. In view of the testimony of the Debtor's President, Patrick LaBella, that the Debtor has not set aside any funds to address Monthly Concession Fee delinquencies because "there hasn't been enough money available for the business to set aside," Tr. January 17, 1995 at 166, this Court must conclude that the Debtor-in-Possession has failed to meet the default "cure", or the "adequate assurance" of prompt cure, requirement of Section 365(b)(1)(A).[3] Likewise, the Court has heard no testimony from

---

1. The evidentiary hearing in this contested matter was held on January 17, January 20, and February 2, 1995. This Court's view of the extent of the Debtor's monetary default is made without consideration of Monthly Concession Fee delinquencies, if any, for months subsequent to January 1995.

2. The Court discerns no Debtor default other than that in the payment of Monthly Concession Fees. Specifically, the Court is persuaded that no performance and payment bond is presently

due under the Concession Agreement since the clear object of the bond requirement—the Debtor's initial capital expenditures—has been completed.

3. Mr. LaBella's testimony to the effect that he believed he could infuse additional money into the business from "another source" "under the proper set of circumstances", Tr. January 17, 1995 at 165–66, is not persuasive on the Section 365(b)(1)(A) cure requirements.

which it could conclude that the Debtor's future performance under the Concession Agreement is adequately assured within the meaning of Section 365(b)(1)(C). Therefore, under the statutory framework of Section 365(a) and (b), the Concession Agreement could not be assumed.

7. However, this rather straight-forward Section 365 statutory analysis, standing alone, is not determinative of the Motion. Relatively recent Second Circuit authority has prescribed the precise standard which this Court must actually apply in determining a debtor-in-possession's motion to assume an executory contract. The Court of Appeals has instructed that a bankruptcy court's determination of such motions should be a "summary proceeding", in which the bankruptcy court must apply its "best business judgment" to determine if it would be beneficial to the estate to assume the subject agreement. *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994),[4] In that respect, *Orion* further instructs:

> In reviewing a trustee's or debtor-in-possession's decision to assume an executory contract ... a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate. Although several bankruptcy courts have read § 365 as authorizing them to resolve questions involving the validity of contracts before

deciding whether to permit the trustee or debtor-in-possession to assume the contracts ... we believe that nothing in § 365 provides such authorization.

*Id.* (internal citations omitted).[5]

■ 8. The Debtor, in reliance upon *Orion*, argues that in deciding this assumption motion the Court need not make findings and/or conclusions, such as those in Conclusions of Law ¶¶ 4, 5 and 6, *supra*, on the Section 365(b) issues of default, damages, cure, etc. The focus, according to the Debtor, is solely upon whether an assumption of the Concession Agreement is a good business decision; a fact, which it claims, is self-evident given, *inter alia*, the Debtor's forfeitable capital investment under the Concession Agreement.[6]

■ 9. A shallow perusal of *Orion*, which itself involved a debtor's alleged prepetition default, could lend support to the Debtor's argument. Yet a more careful reading of that opinion confirms that the Court of Appeals did not intend to preclude the lower courts from consideration of the clear directives of Section 365(b). Although Section 365(b) is not specifically mentioned in the *Orion* opinion, that subsection's essential concepts are embraced in the opinion's language, to wit: "[i]n a given case, a bankruptcy court might decide that it would be beneficial for the ... debtor-in-possession to assume a certain contract *because the court thinks it unlikely that a court would hold that the debtor breached the contract,* and thus assuming the contract would be a good 'business judgment.'" *Orion, supra,* 4 F.3d

---

4. *Orion* cites as authoritative *In re Minges*, 602 F.2d 38 (2d Cir.1979), to wit: "[p]ermitting a bankruptcy court to rule conclusively on a decisive issue of breach of contract would render the use of 'business judgment' required by *In re Minges* unnecessary." *Orion,* 4 F.3d at 1099. *Minges* was decided under Section 413(1) of the *Bankruptcy Act,* and involved a debtor-lessor's proposed *rejection* of a real property lease. As a result, *Minges* arguably provides little, if any, authority for contract *assumption* under Section 365 of the *Bankruptcy Code.* Section 413(1) of the Bankruptcy Act contained no equivalent to Bankruptcy Code Section 365(b)'s default provisions, and for that matter, was devoid of any provisions relating to lease or contract assumption.

5. *Orion 's* articulation of the standards applicable to contract assumption motions has met with lower court criticism within the Second Circuit. *United States Lines, Inc. v. American Steamship Owners Mutual Protection an Indemnity Association Inc., et al. (In re United States Lines),* 169 B.R. 804, 817 n. 14 (Bankr.S.D.N.Y.1994); *In re Best Products,* 168 B.R. 35, 68 (Bankr.S.D.N.Y. 1994).

6. As previously noted, under the Concession Agreement the Debtor's capital investments provided the Debtor with an offsetting credit applied against Monthly Concession Fees totally $211,-695.87. *See* Conclusion of Law ¶ 5, *supra.*

at 1099 (emphasis supplied). Conversely, it follows that in a given case, a bankruptcy court might decide that it would *not* be beneficial for the debtor-in-possession to assume a certain contract because the bankruptcy court thinks it is *likely* a court would hold that the debtor breached the contract with significant adverse economic impact upon the estate, and thus assumption of the contract would be a *bad* "business judgment." In effect, this court reads *Orion* to establish a preliminary "likelihood of success" standard under Section 365(b) when Section 365(b) is applicable. Under this standard, a bankruptcy court does not make findings and/or conclusions which are *final*, or in the words of *Orion*, "formal" and "conclusive"— *i.e.* possessing collateral estoppel effect— with respect to the Section 365(b) issues of "default", "cure", etc. Rather, those issues, if present in a given case, are collapsed into the Court's "business judgment" analysis. For example, if the bankruptcy court *preliminarily* determines that there is a debtor default under a subject contract, the *likely* existence, extent and impact of that default, together with the perceived ability and/or intention of the debtor-in-possession to cure and continue to perform under the contract, will weigh as salient factors informing the court's business judgment.[7]

10. Application of *Orion* to the facts of this case does not alter the consequence of this Court's statutorily-based analysis of and conclusions concerning the issues as set out in Conclusions of Law ¶¶ 4, 5 and 6, *supra*. This is because the Court has concluded that it is highly likely that a court of competent jurisdiction would find the Debtor in default with significant adverse economic impact to the estate. Moreover, the Debtor-in-Possession has failed to convince this Court that it is likely to ever prevail in establishing and quantifying Dam-

ages sufficient to alter that default status and related prospect for future performance. Under these circumstances, this Court must and does conclude, using its "best business judgment," that it would not be beneficial to the bankruptcy estate for the Debtor-in-Possession to assume the Concession Agreement.

Accordingly, the Concession Agreement is not assumable by the Debtor at this time,[8] and the Debtor's Motion for Approval of Assumption of Concession Agreement shall be DENIED.

---

7. Collapsing consideration of a disputed contract default issue into an *Orion*-guided "best business judgment" analysis, without adjudication or formal resolution with collateral estoppel effect of that default issue, creates no friction with the Seventh Amendment. *Cf. Orion, supra*, at 1099 ("... allowing a bankruptcy court to decide a disputed legal contract issue in the course of deciding a motion to assume could usurp litigants' Seventh Amendment jury trial rights").

8. A court's denial of a debtor-in-possession's motion to assume an executory contract does not effect a *pro tanto* rejection of the subject contract. The City has not moved to compel the Debtor to assume *or reject* the Concession Agreement under Section 365(d)(2).