In re PRIME MOTOR INNS, et al., Debtors.

In re SERVICO, INC., et al., Debtors.

Bankruptcy No. 90–16604–BKC–AJC.

United States Bankruptcy Court, S.D. Florida, Miami Division.

Feb. 18, 1991.

John K. Olson, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Tampa, Fla., and Harold D. Moorefield, Jr., Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Fla., for Debtor, Wilpen, Inc.

Charles W. Throckmorton IV, Kozyak, Tropin, Throckmorton & Humphreys, P.A., Miami, Fla., and Irvin W. Sandman, Graham & Dunn, Seattle, Wash., for Westin Hotel Co.

Lynn M. Gelman, Asst. U.S. Trustee, U.S. Dept. of Justice, Office of the U.S. Trustee, Miami, Fla.

Patricia A. Redmond, Miami, Fla., and Alan R. Gordon, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Official Unsecured Creditors' Committee of Servico, Inc. and Related Entities

S. Harvey Ziegler, Kirkpatrick & Lockhart, Miami, Fla., for Dollar Bank.

Chad P. Pugatch, Ft. Lauderdale, Fla., and Thomas P. Lutz, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for Wilpen Unsecured Creditors.

## ORDER GRANTING SERVICO DEBTOR WILPEN, INC.'S MOTION TO REJECT MANAGEMENT AGREEMENT WITH WESTIN HOTEL COMPANY RELATING TO WILLIAM PENN HOTEL

A. JAY CRISTOL, Bankruptcy Judge.

Wilpen Inc.'s ("Wilpen" or "Debtor") Motion to Reject Management Agreement with Westin Hotel Company (C.P. # 87) came on for full evidentiary hearing before the Court on Thursday, January 17, 1991, at 9:00 a.m. The Court observed the demeanor of the witnesses and found all to be credible. For the reasons set forth below, Wilpen's motion is hereby granted.

### FACTUAL BACKGROUND

Wilpen, one of the forty-six (46) affiliated debtors of the jointly administered Servico, Inc. ("Servico") bankruptcy case, is the owner of the William Penn Hotel ("William Penn") located in Pittsburgh, Pennsylvania. The William Penn, an historic landmark, is a five hundred ninety-five (595) room full-service hotel.

Wilpen's prior shareholder negotiated a twenty-year management agreement (the "Agreement") that Wilpen entered into with Westin and under which Westin agreed to manage the William Penn for Wilpen. The parties agreed that the twenty (20) year period would not begin until the completion of a major renovation program. The renovation program was essentially completed in 1987, and the Agreement therefore expires in 2007.

In 1987, when Servico purchased the stock of Wilpen, the William Penn was already operating under the Agreement with Westin. Servico thus was subject to the bargain struck by Wilpen's previous owner with Westin. Unfortunately, Servico has not received any benefit from this bargain because the property has produced no income to Wilpen, a fact undisputed by Westin. (See Answer # 9 to Wilpen's First Set of Interrogatories.)

Through Servico's acting Chief Executive Officer (David Hawthorne), Debtor made an analysis of the Agreement and presented this Court with a good faith, rational explanation of why the Agreement should be rejected. Debtor claims that under the management of Westin the property has not produced any income to Wilpen and the Agreement is otherwise burdensome because (1) Westin's management fee is too

high in today's marketplace, and in such a competitive market, Debtor could obtain a better fee; (2) the Agreement contains no meaningful budget approval process, and although Westin may seek Debtor's approval of a proposed budget, should Debtor fail to respond or respond negatively, Westin is allowed to operate in accordance with the prior year's budget and has complete discretion to incorporate expenditures it deems necessary; (3) the Agreement contains no performance standard clause subjecting Westin to risk of termination if that standard is not achieved; and (4) the Agreement contains no termination-on-sale clause. Debtor argues that the Agreement reduces the value that Debtor could achieve on a sale of the William Penn simply because a new owner could not manage (or control the management of) the property as he deems appropriate.

While Debtor does not claim that Westin is necessarily a poor management company, Debtor presented evidence from Servico's Vice President of Operations and expert testimony that income from the hotel could be realized if the hotel was managed in a slightly different style which would increase revenues and reduce costs. Testimony of Debtor and its expert established that a more favorable agreement could be negotiated with another nationally known hotel management company, such as Omni, Ramada Renaissance, or Radisson. Debtor asserts that regardless of Westin's ability or reputation, its performance and failure to generate any income for Debtor compels Debtor to reach the business judgment that the Agreement must be rejected and replaced with a more favorable contract with an operator capable of generating income

for the Debtor and enhancing the value of the William Penn.

In contrast, Westin argues that its operation of the William Penn has been very good. Westin believes that its management performance is constantly improving and that money will soon flow to Debtor. Moreover, Westin asserts that if it were replaced, certain existing bookings and potential bookings would be lost. Westin contends that other operators could not sustain revenues which, if curtailed, would reduce the William Penn's net operating income even more and negatively impact the hotel's value. Westin also asserts that no income has been produced to Debtor because otherwise available income has been used to pay the mortgage debt encumbering the hotel which debt is excessive in relation to the hotel's value. To support its position, Westin's expert testified that Westin is the best management company for the William Penn and that Debtor's suggested replacement candidates clearly would not operate the hotel as well as Westin. The Court was impressed by Westin's expert and his analysis.

Westin further argues that the estate is currently solvent based upon existing claims and an appraisal quoting the hotel's value at twenty-two million dollars ($22,000,000.00) and that if the hotel were sold the proceeds could pay all claims in full. Westin asserts that Wilpen is taking an unnecessary risk in replacing management and that if the new operator cannot perform as well as Westin, then the value of the hotel will decrease, thereby rendering the estate insolvent when burdened with Westin's rejection claim, which Westin estimates to be $7,300,000.00.[1]

1. Westin presented evidence to the effect that if the Agreement is rejected, Westin would not fire any of its employees who currently work at the William Penn, and said employees would be absorbed into Westin's vast managerial network and assigned to other facilities. Based upon this premise, Westin argues that its entire fee under the Agreement is profit (i.e., that none of its direct expenses in connection with the management of the William Penn, and none of its general overhead, should be allocated to the William Penn). Such an argument is specious at best. The Court notes that expert testimony established that a management company's expenses are generally one-half to two-thirds of its fee. If Westin's rejection claim for its lost fee would be $7,300,000.00, then a reduction of one-half to two-thirds for expenses would leave a true claim (i.e., one reflective of the actual lost profit) of $3,650,000.00 to $2,433,333.33. The Court is not by any means suggesting that the foregoing figures are for any purpose other than illustration, but the Court notes that the reduced claim figures would not appear to render the estate insolvent.

Other parties took varied positions in this case. The mortgagee of the hotel and Wilpen's Unsecured Creditors Committee opposed Westin's rejection of the Agreement. However, the Servico Unsecured Creditors Committee supported Wilpen's rejection of the Agreement.

## DISCUSSION

■ Debtor seeks to reject the Agreement under Section 365(a) of the Bankruptcy Code (the "Code"). Section 365 provides in pertinent part that "the Trustee, subject to the Court's approval, may assume or reject any executory contract of the debtor." 11 U.S.C. § 365(a) (1979). Section 1107 of the Code makes Section 365 applicable to Debtor. The parties stipulate that the Agreement is an executory contract within Section 365(a) of the Code. Significantly, Section 365(a) contains no conditions that a debtor must satisfy before rejecting an executory contract and is among most important powers granted by Congress to a debtor to facilitate its rehabilitation.

In accordance with the United States Supreme Court, this Court continues to recognize the long standing "traditional business judgment standard applied by the Courts to authorize rejection of the executory contract." *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). This Court accepts the prevailing view that the proper test for determining whether a Court should approve a debtor in possession's motion to reject an ordinary executory contract is the business judgment test.

■ Both sides agree that "business judgment" is the appropriate standard and make persuasive arguments so that this Court could rationally select the judgment of Debtor (and its expert) or Westin (and its expert). If the proper standard of review were preponderance of the evidence or greater weight of the evidence, then this would be a difficult case to decide, because reasonable people could differ as to whether the rejection of the Agreement would result in an increase in the net operating income of the William Penn. Section 365(a) of the Code and supporting case law make

it clear to this Court, however, that the Court cannot substitute its judgment for Debtor's judgment. The business judgment standard requires that this Court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim or caprice. *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

■ This Court acknowledges that a debtor's rejection of an executory contract is proper if it would be advantageous to the debtor's estate. The Second Circuit in *In re Minges*, 602 F.2d 38 (2d Cir.1979), stated that "[i]t is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate." The court continued its analysis of the business judgment test:

> [W]ithout explicitly using the "business judgment" terminology a number of Courts have employed the substance of that test in emphasizing potential greater profit for the debtor's estate in deciding whether to permit rejection of a particular contract [citations omitted]. We believe that such a flexible test for determining whether an executory contract may be rejected, however termed (and "business judgment" is as good a label as any), is most appropriate.

*Id.* See also *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3rd Cir.1989) (adopting the business judgment test, the Third Circuit held that Sharon's motion to reject a natural gas utility service agreement was properly granted upon the bankruptcy court's finding that "the rejection would benefit the estate"); *In re Tilco*, 558 F.2d 1369 (10th Cir.1977); *In re Chi–Feng Huang*, 23 B.R. 798 (9th Cir.BAP 1982).

■ This Court finds that sufficient competent evidence has been presented to support a conclusion that Wilpen's rejection of the Agreement would benefit the estate. By eliminating the Agreement, Wilpen could improve the overall bottom line net operating income by at least the difference between the amount of the management

382

fee it pays Westin and what it will pay to the successor management company. Wilpen's rejection of the Agreement could reduce operating costs at the hotel, thus benefiting the estate and its creditors through the creation of greater profits for Debtor's estate and the increase in the value of the estate's principal asset—the hotel.

Rejecting the Agreement with Westin is a reasonable business decision for Wilpen. The Fourth Circuit in *Lubrizol* explained the business judgment rule as follows:

As generally formulated and applied in corporate litigation the rule is that courts should defer to—should not interfere with—decisions of corporate directors upon matters entrusted to their business judgment except upon a finding of bad faith or gross abuse of their "business judgment."

.   .   .   .   .

The issue ... is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith or whim or caprice.

756 F.2d at 1047. This Court believes that rejecting a contract with an apparently high management fee, no budget approval provision, and no performance standard clause can be deemed reasonable. Moreover, Wilpen's desire to engage a new management company at a lower fee and to obtain an agreement which includes a budget approval or performance standard provision cannot be deemed the product of bad faith, whim or caprice.

Westin asserts that a new management company may not generate greater revenues and might even cause the William Penn to decline in value. However, such evidence fails to counteract the broad application of the business judgment standard. In *In re Huff*, 81 B.R. 531 (Bankr.D.Minn. 1988), the Eighth Circuit adopted the business judgment test, stating that "[t]hose courts which have adopted the business judgment test generally emphasize that the test is to be liberally applied, and that the motion to reject should ordinarily be granted." *Id.* at 537. In addition, this Court

concluded in *In re Waldron*, 36 B.R. 633 (Bankr.S.D.Fla.1984), *rev'd on other grounds*, 785 F.2d 936 (11th Cir.1986), that:

A "business judgment" test ... gives the debtors the latitude in exercising their discretion which is more consistent with what Congress had intended under the Code.

*Id.* at 641.

Although a new management agreement with a different company may not generate greater profits for Debtor, there is no guarantee that Westin will continue to maintain its present reputation or performance levels or prevent the William Penn from declining in value. Applying the business judgment test, rejection is in the best interest of Wilpen because the hotel does not currently produce any positive income for Debtor and a new management contract has the potential of generating greater profit for Debtor's estate. Westin's claim that the hotel's mortgage debt created by Debtor is excessive and the primary cause of Debtor's failure to realize income from the hotel was refuted by the testimony of Westin's own expert. Westin's expert testified that in today's hotel marketplace, a purchaser commonly obtains financing to facilitate the acquisition of a hotel in an amount equal to 70% of the hotel's value. As the William Penn has a value of $22 million while encumbered by mortgage debt of only approximately $15.5 million, Westin's expert concluded that the hotel's debt to value ratio was within accepted norms and therefore the hotel was not "overleveraged".

The burden on the movant in this case is merely to produce "any credible evidence that rejection would benefit the estate or result in a successful reorganization." *In re Sun City Investments, Inc.*, 89 B.R. 245, 249 (Bankr.M.D.Fla.1988). Wilpen has met its burden by showing this Court that a reduction in the management fee and the possible inclusion of a budget approval clause or performance provision would be beneficial to the estate. Moreover, denial of Wilpen's rejection motion would not encourage a successful reorganization because the hotel is not generating any income for Debtor to utilize in a reorganiza-

tion plan, and Debtor would therefore likely be forced to adopt the "sale of the William Penn" as its Chapter 11 reorganization plan. Furthermore, prospective purchasers, if any, would probably be limited in number due to and discouraged by the remaining 16–year term of the Agreement.

█ Even if this Court believed Wilpen's rejection of the Agreement would greatly affect Westin, such a factor is not proper for consideration in our decision to grant Wilpen's motion to reject the Agreement with Westin. *Borman's, Inc. v. Allied Supermarkets, Inc.,* 706 F.2d 187, 189 (6th Cir.1983) ("the burden or hardship which rejection would impose on other parties to such a contract is not a factor to be weighed by the bankruptcy court in ruling upon the debtor's application." (citing *In re Mammoth Mart,* 536 F.2d 950, 954 (1st Cir.1976))); *See also In re Gray Truck Line Co.,* 34 B.R. 174 (Bankr.M.D.Fla.1983) (application of business judgment test does not call for balancing of equities nor consideration of the impact of the rejection on another party to contract).

The rationale employed and conclusions reached in these decisions in large part are based upon Congress' omission from Section 365(a) of any conditions whatsoever that must be satisfied before a debtor may be permitted to reject an executory contract. The *Lubrizol* court, recognizing the potential for harsh results, stated that:

> It cannot be gainsaid that allowing rejection of such contracts as executory imposes serious burdens upon contracting parties such as Lubrizol. Nor can it be doubted that allowing rejection in this and comparable cases could have a general chilling effect upon the willingness of such parties to contract at all with businesses in possible financial difficulty. But under bankruptcy law, such equitable considerations may not be indulged by courts in respect of the type of contract here in issue. Congress has plainly provided for the rejection of executory contracts, notwithstanding the obvious adverse consequences for contracting parties thereby made inevitable.

756 F.2d at 1048. The Code permits Westin to file a claim for damages pursuant to 11 U.S.C. § 365(g)(1) and § 502(g).

## CONCLUSION

█ This Court finds that Debtor's business judgment to reject the Agreement in order to bargain with another management company for lower fees, a budget approval clause, a performance standard provision and a termination-on-sale clause is sound and certainly not the product of bad faith, whim or caprice. This Court therefore must conclude that pursuant to the business judgment standard and the purposes of Chapter 11, Debtor is permitted to reject the Agreement. Recognizing the importance that the William Penn be managed by a nationally known operator, this Court mandates that Debtor's new management agreement be with a national operator and include one or more of the following provisions: budget approval clause, performance standard provision and termination-on-sale clause. Accordingly, the Debtor's Motion To Reject Management Agreement with Westin Hotel Company be and the same is hereby granted.

DONE and ORDERED.