## In re SURFSIDE RESORT AND SUITES, INC., Debtor.

### No. 04–9469–3F1.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

April 21, 2005.

---

**466**

Walter J. Snell, Daytona Beach, FL, for Debtor.

Richard R. Thames, Jacksonville, FL, for Royal Surfside.

John B. MacDonald, Akerman Senterfitt, Jacksonville, FL, for Bray & Gillespie X, LLC.

L. William Porter, Office of U.S. Trustee, Orlando, FL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This case came before the Court upon Debtor's Motion for Authority to Reject Executory Contract (the "Motion to Reject"). The Court conducted hearings on the matter on January 13, 2005 and February 10, 2005. In lieu of oral argument, the Court directed the parties to submit memoranda. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtor is the owner and operator of an oceanfront hotel located in Ormond Beach, Florida (the "Hotel"). The Hotel is cur-

rently closed. The Hotel, Debtor's only substantial asset, is encumbered by two mortgages. The first mortgage is held by Bray & Gillespie IX, LLC ("Bray & Gillespie"). The second mortgage was held by the United States Small Business Administration (the "SBA") until October of 2004, when Bray & Gillespie acquired that mortgage as well.

Debtor has not made a payment on the Bray & Gillespie mortgage since May 2003 and has not made a payment on the SBA mortgage in several years. (Tr. at 75). As a result of Debtor's default, Bray & Gillespie instituted foreclosure proceedings. On May 18, 2004 Bray & Gillespie obtained a final judgment of foreclosure determining that it was owed $8,300,034.08 and setting a foreclosure sale for June 10, 2004. Paragraph 2 of the foreclosure judgment states that "interest from and after May 18, 2004, through the date of the sale of the property, shall continue to accrue at the per annum rate of 7% and the per diem rate is $1,591.78." (Royal Surfside Ex. 37).

In order to stay the foreclosure sale Debtor filed a Chapter 11 bankruptcy petition on June 9, 2004. During the Chapter 11 case Debtor determined that it could not reorganize its affairs to continue operation of the Hotel and therefore sought to sell it. On August 8, 2004 Debtor entered into a purchase and sale contract with Starquest Investments (the "Royal Surfside Contract")[1] pursuant to which Starquest agreed to purchase the Hotel for $11,000,000.00. (Royal Surfside Exs. 1–4). Under the terms of the Royal Surfside Contract, $10,000,000.00 of the purchase price would be paid at closing with the remaining balance paid over a 6 to 12 month period following closing. (Id.) Ad-

---

1. Starquest subsequently assigned its interest under the purchase and sale contract to Royal Surfside, LLC ("Royal Surfside"), an affiliated entity. (Royal Surfside Ex. 6).

ditionally, the Royal Surfside Contract provided that the real estate commission for the sale of the Hotel would be split between 1) Realty Services International, Inc. ("RSI"), a company owned by the wife of Wes Sattenfield ("Sattenfield"), the president of Debtor, and 2) ReMax Realty. (Royal Surfside Ex. 1).

In anticipation of a dismissal of the Chapter 11 case and the closing of the Royal Surfside Contract, Debtor stipulated with Bray & Gillespie to reschedule the foreclosure sale for September 17, 2004. (Tr. at 33–34). The Chapter 11 case was dismissed on August 20, 2004. The closing of the Royal Surfside Contract was scheduled for September 16, 2004. (Tr. at 34).

As of September 16, 2004 the first mortgage indebtedness under Bray & Gillespie's foreclosure judgment totaled approximately $8,486,510.00. (Royal Surfside Ex. 39). The mortgage indebtedness to the SBA totaled approximately $1,200,000.00. To facilitate the sale, Debtor obtained an estoppel letter from the SBA indicating that it would accept a reduced payoff of $550,000.00 on the second mortgage if payment was received by September 30, 2004. (Royal Surfside Ex. 7). Taking into account the reduced payoff to the SBA, real estate commissions, payment of delinquent taxes and other closing costs, Debtor would have been able to deliver clear title to the Hotel upon payment by Royal Surfside of the $10,000,000.00 purchase price at closing. Debtor anticipated having approximately $277,000.00 left for payment to its unsecured creditors. (Royal Surfside Ex. 39).

In late August and early September 2004 the Hotel suffered substantial damage as a result of Hurricanes Frances and Charley. (Tr. at 34–35). Although the Royal Surfside Contract called for cash at closing with no financing contingency, Royal Surfside needed and sought financing in order to fund the purchase price. Mary Campsen, one of Royal Surfside's principals, testified that Royal Surfside had difficulty securing financing commitments as a result of its lenders' concerns regarding its ability to obtain insurance for the Hotel. (Tr. at 175–176). Sattenfield testified that Debtor had obtained an insurance binder in order to permit the closing to occur on September 16, 2004. (Tr. at 70).

Recognizing that the closing was not going to occur on September 16, 2004, Debtor requested a postponement of the September 17, 2004 foreclosure sale. The state court denied the request. The closing did not occur. Late in the evening on September 16, 2004 Debtor and Royal Surfside entered into an addendum extending the closing date to the later of October 17, 2004 or a date approved by the bankruptcy court. (Royal Surfside Ex. 5). On that same day Royal Surfside entered into a management contract with RSI pursuant to which RSI agreed to manage the Hotel for Royal Surfside's benefit until closing. (Royal Surfside Ex. 8). The management services were to be provided directly by Sattenfield. (Id.) RSI received a $10,000.00 prepayment from Royal Surfside for Sattenfield's anticipated services. (Royal Surfside Ex. 9).

On September 17, 2004 Debtor filed a second Chapter 11 bankruptcy petition. As of that date, Debtor had not negotiated with any other person or entity for the sale of the Hotel. (Tr. at 71–72). Mary Campsen testified that up until the filing of the second Chapter 11 case, Debtor acted in good faith in seeking to close and subsequently to extend the Royal Surfside Contract. (Tr. at 201).

Sattenfield testified that during the latter part of September 2004 Bray & Gilles-

pie informed him that it felt Starquest[2] could not "close the deal". (Tr. at 54). On September 29, 2004 Bray & Gillespie filed Motion to Prohibit or Condition the Use of Cash Collateral. (Royal Surfside Ex. 38). On that same day Sattenfield, Debtor's attorney and Bray & Gillespie's attorney met to discuss a potential acquisition of the Hotel by Bray & Gillespie. Sattenfield testified that at the time of the meeting he "had some heavy concerns, because that was close to the period of time that I still had lenders wanting appraisals. I had doubts and I had expressed those doubts many times to their broker, on their ability to close." (Tr. at 55). Notwithstanding his concerns, Sattenfield testified that his allegiance remained with Royal Surfside. (Tr. at 55).

On October 5, 2004 Bray & Gillespie submitted a proposal (the "first proposal") to Debtor concerning the purchase of the Hotel. (Royal Surfside Ex. 20). The first proposal essentially matched the Royal Surfside Contract in terms of dollars, with the exception that Bray & Gillespie would "credit bid" its first mortgage toward the purchase. The first proposal also indicated that Bray & Gillespie anticipated negotiating with the SBA to acquire the second mortgage position. Debtor rejected the first proposal.

On October 19, 2004 Bray & Gillespie submitted a second proposal (the "second proposal") to Debtor. (Royal Surfside Ex. 21). The second proposal indicated that Bray & Gillespie had by that time acquired the SBA's second lien position. The second proposal provided for payment of all mortgage indebtedness, taxes, commissions, and closing costs with adequate funds to pay all of Debtor's then-known unsecured creditors in full at closing and also yield a distribution to equity shareholders no later than six months from the date of closing. The net proceeds available to unsecured creditors and shareholders under the second proposal was $742,000.00. Finally, the second proposal provided that Bray & Gillespie would pay the entire real estate commission for the sale of the Hotel to RSI and would pay it directly (to RSI) instead of paying it through the estate.

In order to pursue the Bray & Gillespie proposal, Debtor decided to reject the Royal Surfside Contract. Sattenfield testified that Debtor's decision to reject the Royal Surfside contract and to pursue the Bray & Gillespie proposal resulted from Debtor's exercise of its business judgment as to the best interests of Debtor's estate. (Tr. at 65). Upon the loss of the SBA discount, Debtor recognized that it could no longer perform under the Royal Surfside Contract because the cash proceeds due at closing would be insufficient to close.[3] (Tr. at 65). If Royal Surfside had paid the entire $11,000,000.00 purchase price at closing, the net proceeds available

---

**2.** Although Sattenfield referred to Starquest, a review of the transcript and the documentary evidence suggests he intended to refer to Royal Surfside.

**3.** If the Royal Surfside contract had closed on October 17, 2004, the following obligations would have been required to be paid from the $10,000,000.00 received at closing in order for Debtor to deliver clear title to the Hotel.

| | |
|---|---|
| Bray & Gillespie first mortgage (including interest at the statutory judgment rate) | $8,541,984.64 |
| SBA second mortgage (held by Bray & Gillespie) | 1,205,000.00 |
| Commissions and closing costs | 491,000.00 |
| 2003 delinquent real estate and tangible personal property taxes | 178,000.00 |
| 2004 taxes, prorated through closing | 118,640.00 |
| Total: | 10,534,624.64 |
| Shortfall of cash necessary to close: | $(534,624.64) |

to unsecured creditors and shareholders would have been $465,378.36. In light of the fact that the $1,000,000.00 payment under the Royal Surfside Contract could be extended up to a year following closing, the Bray & Gillespie proposal provided a more certain pool of funds for the payment to Debtor's unsecured creditors. (Tr. at 226). Sattenfield testified that when Debtor decided to reject the Royal Surfside Contract it considered the fact that Royal Surfside would have a claim for damages and factored those estimated damages into its decision. (Tr. at 252).

Having determined to reject the Royal Surfside Contract, on December 1, 2004 Debtor entered into a Purchase and Sale Agreement for the sale of the Hotel to Bray & Gillespie (the "Bray & Gillespie Contract"). The Bray & Gillespie Contract mirrored the terms set forth in the second proposal. On December 7, 2004 Debtor filed a Plan of Reorganization (Royal Surfside Ex. 22) and Disclosure Statement (Royal Surfside Ex. 23) based upon the sale of the Hotel under the Bray & Gillespie Contract.

### CONCLUSIONS OF LAW

■ Debtor seeks authority to reject the Royal Surfside Contract. Section 365(a) of the Bankruptcy Code provides that a debtor may assume or reject an executory contract subject to court approval. Section 1107 of the Bankruptcy Code makes § 365 applicable to Chapter 11 debtors-in-possession. A bankruptcy court should apply the business judgment test in determining whether to permit a debtor in possession to reject an executory contract. *See In re Prime Motor Inns,* 124 B.R. 378, 381 (Bankr.M.D.Fla.1991). The business judgment test requires a showing that rejection of the contract will likely benefit the estate. *In re H.M. Bowness, Inc.,* 89 B.R. 238, 241 (Bankr.

M.D.Fla.1988). A court may not substitute its judgment for that of a debtor unless the debtor's decision that "rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice." *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047 (4th Cir.1985).

■ Royal Surfside challenges Debtor's decision to reject the Royal Surfside contract on three bases. First, Royal Surfside contends that Debtor erroneously relied on information suggesting there was insufficient money to close the deal on October 17, 2004 when in fact there was enough money to close the deal. However, Royal Surfside itself concedes that a minimum of $10,531,441.00 would have been required in order for Debtor to deliver clear title to the Hotel on October 17, 2004, far less than the $10,000,000.00 Royal Surfside was required to pay at closing. Accordingly, the Court finds Royal Surfside's first argument to be without merit.

Secondly, Royal Surfside argues that the rejection of the Royal Surfside Contract will not benefit the estate because the breach of the contract will result in a substantial claim against the estate which threatens to eliminate any meaningful distribution to unsecured creditors. Specifically, Royal Surfside argues that Debtor's breach of the contract was a "bad faith" breach. Royal Surfside contends that it will be entitled to full expectation damages and that its consequent claim will significantly reduce the distribution to unsecured creditors without producing any additional benefit to the estate. The Court finds it appropriate to defer the determination of Royal Surfside's damages to a hearing on an objection to claim. Moreover, as Debtor points out, the extent to which a rejection claim might offset a benefit to the

estate is a function of a debtor's exercise of its business judgment. Sattenfield's testimony establishes that Debtor took into account the effect of Royal Surfside's potential rejection claim in reaching its decision to reject the Royal Surfside Contract. The Court finds that Debtor proved that rejection of the Royal Surfside Contract will likely benefit the estate.

Finally, Royal Surfside argues that Debtor's decision to reject the Royal Surfside Contract is the result of bad faith, whim or caprice. Specifically, Royal Surfside contends that Sattenfield was motivated by a desire to retain for RSI all of the real estate commissions from the sale of the Hotel instead of splitting them with ReMax. The Court recognizes that Debtor's decision to reject the Royal Surfside Contract may have been influenced to some extent by Sattenfield's desire to have RSI retain the entire real estate commissions. However, the Court finds that Debtor proved that the rejection of the Royal Surfside Contract will likely benefit the estate. Accordingly, the Court finds Royal Surfside's final argument to be without merit.

### CONCLUSION

Because Debtor proved that the rejection of the Royal Surfside Contract is likely to benefit the estate, Debtor has satisfied the business judgment test and will be permitted to reject the Royal Surfside Contract. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

### ORDER GRANTING DEBTOR'S MOTION FOR AUTHORITY TO REJECT EXECUTORY CONTRACT

This case came before the Court upon Debtor's Motion for Authority to Reject Executory Contract. Upon Findings of Fact and Conclusions of Law separately entered, it is

ORDERED:

1. Debtor's Motion for Authority to Reject Executory Contract is granted.

2. The Royal Surfside Contract is deemed rejected.