**In re A.J. LANE & CO., INC., Lane Homes, Inc., Lane Management, Inc. Fountainhead Associates of Westborough, Andrew J. Lane, Debtors.**

**Bankruptcy Nos. 89–40268–JFQ to 89–40272–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

Nov. 27, 1989.

Charles R. Dougherty, Hill & Barlow, Boston, Mass., for debtors.

Andrew Z. Schwartz, Foley, Hoag & Eliot, Boston, Mass., for Santa Fe Pacific Realty Corp.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

The Debtor Andrew J. Lane moves to reject, pursuant to 11 U.S.C. § 365, a re-purchase option contained in his deed of property in Ontario, California which he now wishes to sell rather than develop. Opposed to the motion is the successor-in-interest to the original grantor. The motion was granted by order dated November 20, 1989, which the court issued while this opinion was in draft form in order to facilitate a pending sale.

The facts are undisputed. Andrew J. Lane ("the Debtor"), as well as the other affiliated debtors in these administratively consolidated Chapter 11 proceedings, is engaged in the construction, development and management of commercial and residential real estate. On November 16, 1987 he purchased from Southern Pacific Development Company ("Southern Pacific") 16 acres of commercially zoned land in Ontario, California for the purpose of erecting commercial property thereon. Because Southern Pacific retained property in the vicinity whose value it wished to have enhanced by development of the entire area, the purchase and sale agreement gave Southern Pacific the right to repurchase if the Debtor did not develop the property. The deed accordingly provided that the Debtor "shall, following the recordation of this deed, construct one or more buildings comprised of at least 200,000 square feet of floor area ... to be completed on or before November 17, 1991 ..." The deed goes on to state that if the Debtor does not so construct by then, Southern Pacific would have the right during the 90–day period following November 17, 1991, to elect to repurchase the property for about $2.8 million, the same price the Debtor paid Southern Pacific, less any debt secured by encumbrances placed on the property during the Debtor's ownership. The deed further gives Southern Pacific the option to repurchase within 90 days after being notified by the Debtor during the first year of his intention not to build on the property. Southern Pacific also has approval rights over any construction plans.

In financial straits because of the depressed real estate market, the Debtor and his affiliates filed Chapter 11 petitions with

the court on March 24, 1989. Many of their commercial and residential projects are only partially completed, and a number of those which have been completed contain units which are neither occupied nor under commitment for lease or purchase. Some, including the property in question, have not been developed at all. The Debtor and his affiliates are now in the process of negotiating the framework of a substantively consolidated Chapter 11 plan of reorganization. They expect to file a formal plan with the court within a month. The plan will involve the liquidation of a number of properties; only those whose development or management present the most feasible short-term income potential will be retained. The Debtor is under considerable pressure from mortgagees to complete this process soon in order to avoid foreclosure upon a number of properties.

Next to the property in question is an improved parcel which is also owned by the Debtor. Both properties are among those which the Debtor wishes to sell in order to obtain ready cash for the funding of a consolidated Chapter 11 plan. He has signed an agreement with one Jack M. Langson to sell both parcels for a gross price of $16.5 million, without allocation of a portion of the purchase price to either parcel. With a closing scheduled in a few weeks, the sale would net the Debtor about $3 million after payment of encumbrances. The purchaser refuses to complete the transaction if the undeveloped parcel remains subject to the option, which is now held by Santa Fe Pacific Realty Corporation ("Santa Fe") as successor-in-interest to Southern Pacific. As successor, Santa Fe also holds title to the other property in the vicinity owned by Southern Pacific at the time of the original sale.

## I. THE OPTION AS AN EXECUTORY CONTRACT UNDER § 365 OF THE BANKRUPTCY CODE

Section 365 of the Bankruptcy Code (11 U.S.C. § 365) provides, with exceptions not relevant here, that "subject to the court's approval" a trustee in bankruptcy (or debt-

or in possession exercising the powers of a trustee pursuant to § 1107) "may assume or reject any executory contract or unexpired lease of the debtor." Rejection generally constitutes a breach of the contract or lease. § 365(g).

The parties dispute whether the option is an "executory contract" within the meaning of the statute. The legislative history offers minimal guidance:

> Though there is no precise definition of what contracts are executory, it generally *includes* contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer necessary. (Emphasis added). H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 6303; S.Rep. No. 95–989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5844.

Professor Countryman offers this definition: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L. Rev. 439, 460 (1973). He reasons that a contract which has been performed by the debtor falls outside the concept of an executory contract because assumption adds nothing to the debtor's claim to performance by the other party, and rejection makes no sense. *Id.* at 459. Where the other party has already performed, he sees similar logical difficulties; the estate already has the benefit of the contract, so that assumption is unnecessary, and rejection would neither add to nor detract from the creditor's claim. *Id.* at 451. Although there may be exceptions to this logic for unusual situations,[1] Countryman's test of practicality seems sound.

---

1. For example, where the debtor is the seller of     uncompleted goods being specially made for a

The option here meets these criteria. It is part of a larger contract, the initial purchase and sales agreement, under which there remains further and substantial performance by both Santa Fe and the Debtor should Santa Fe decide to exercise its rights. Santa Fe would have us believe that the option is executory only with respect to the Debtor's performance, and that it therefore falls outside the scope of § 365. But an option has unusual characteristics. It is a unilateral contract until exercised; upon exercise, it becomes a bilateral contract. W. Jaeger, *Williston on Contracts* § 61B (3d ed. 1963). It is the contingency of exercise which makes the option executory for our purposes. Upon exercise, substantial performance remains on both sides—conveyance of the property by the Debtor and payment of the purchase price by Santa Fe. A material breach would occur should either party refuse to complete the transaction after exercise.

Viewing this agreement as an executory contract subject to rejection is consistent with the Countryman test of practical logic. The present posture of the agreement is quite unlike, for example, a contract of sale where goods have been delivered to a debtor on credit; rejection under those circumstances cannot alter the estate's obligation to pay. Here rejection converts a contingent *in rem* obligation into a fixed monetary one so as to permit the Debtor to deal with the property in order immediately to benefit his reorganizational efforts. The pending sale of this property and the adjoining parcel will bring in far more funds than would exercise of the option. And those funds would be generated now, whereas under the option funds may be generated two years from now, and perhaps never.

The decisions favor regarding an option, or the analogous right of first refusal, as an executory contract within the meaning of § 365. *E.g., Steffan v. McMillan (In re Coordinated Financial Planning Corp.),* 65 B.R. 711, 713 (Bankr. 9th Cir.1986); *In re Hardie,* 100 B.R. 284, 287 (Bankr.E.D.N.

C.1989); *In re Waldron,* 36 B.R. 633, 636 (Bankr.S.D.Fla.1984), *rev'd on other grounds,* 785 F.2d 936 (11th Cir.1986). The contingency of the option exercise does not make the agreement non-executory. *In re G–N Partners,* 48 B.R. 462, 465 (Bankr.D. Minn.1985). The decision in *Brown v. Snellen (In re Giesing),* 96 B.R. 229 (Bankr.W.D.Mo.1989) is distinguishable. That case involved an attempted rejection by the holder of an option to purchase, presumably on the erroneous theory that rejection would entitle him to a return of the separate consideration paid for the option. The court properly held that the option in those circumstances was not executory. *Id.* at 232. Because the holder was in effect renouncing his election to purchase, the contract never could ripen into a bilateral contract unperformed on both sides. *Id.* at 232. *In re Continental Properties, Inc.,* 15 B.R. 732, 736 (Bankr.D. Haw.1981) involved an expired option to purchase in the context of automatic stay litigation; the court's reference to the option as non-executory was based only upon its present status under state law as a unilateral contract.

Santa Fe says that a contract must be assumed or rejected in its entirety, and that the requested rejection violates this rule because the Debtor wishes to retain the property. This is sophistry. The Debtor seeks to reject the entire *remaining* portion of the contract. That is all that can be rejected. Where there has been partial performance by the non-debtor party, rejection leaves that performance undisturbed. Rejection under § 365 is simply that; it is not rescission. *In re Metro Transportation Co.,* 87 B.R. 338, 343 (Bankr.E.D.Pa. 1988); *Rudaw/Empirical Software Products LTD. v. Elgar Electronics Corp. (In re Rudaw/Empirical Software Products, LTD.),* 83 B.R. 241, 246 (Bankr.S.D.N.Y. 1988); *In re Executive Technology Data Systems,* 79 B.R. 276, 282 (Bankr.E.D.Mich. 1987). All property which has become part of the bankruptcy estate under § 541 re-

---

buyer who has already paid in full, it may make sense for the bankruptcy estate to assume and complete the contract in order to reduce the buyer's potentially large damage claim.

mains undisturbed by rejection under § 365. We presume, as urged by Santa Fe, that the option was a major part of its motivation in entering into the transaction. But that is true of all material unperformed aspects of any contract whose performance a debtor seeks to reject. It goes only to Santa Fe's damages, not to whether the contract is executory.

Santa Fe's reliance upon *In re Texstone Venture, LTD.*, 54 B.R. 54 (Bankr.S.D.Tex. 1985) is misplaced. There a debtor had borrowed money, agreeing to repay the principal either in cash or through the lender's exercise of an option to acquire equity in the debtor. The court prohibited rejection of the lender's equity option because the loan agreement was not executory on both sides—the lender had fully performed through its advance of the funds. *Id.* at 56. Attempted rejection of the option in these circumstances was viewed by the court as much like attempted rejection of a matured obligation to pay money in a currency to be selected by the lender. The court did not apply a test of practicality to the rejection in order to ascertain whether rejection would benefit the estate.

Santa Fe also argues that the Debtor seeks to disturb a property interest, emphasizing that the option is contained in a deed. But this does not make the option a property interest. It is only a contract right—the right to purchase—whose remedy is normally specific performance. That the world is given notice of this right though its appearance in a recorded deed prevents any other buyer from claiming the equities of an innocent third party, but that is all.

Congress certainly knows how to protect property interests from termination through rejection. Rejection by a lessor of real estate, by a seller of timeshare realty interests, or by a licensor of intellectual property does not terminate the property interest of the other party unless that party elects to treat his interest as terminated. § 365(h) and (n). Similar protection is given a purchaser in possession under the debtor's executory contract to sell real property. He is entitled to remain in possession notwithstanding the debtor's rejection of the contract, provided that he continues to make payments under the contract, and he has the right to offset against the remaining purchase price any damages caused by the debtor's non-performance. § 365(i). Upon completion of the payments, the bankruptcy estate is required to deed him the property. *Id.* If the purchaser chooses to treat the contract as terminated, he has a lien on the property for recovery of that part of the price already paid. § 365(j). Purchasers in possession were granted these rights in response to dissatisfaction with the absence of clear statutory protection for a consumer purchaser under a so-called "land sale contract," which involves payments over a number of years while the buyer is in possession. A buyer in these circumstances was considered to have particularly strong equities militating against rejection, and some courts regarded the arrangement as the practical equivalent of a mortgage. *See, Report of the Commission on the Bankruptcy Laws of the United States*, H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Part II, § 4–602(d) and 4–602(f)(1) (1973). The Commission's recommendations were based upon a working paper (*See Id.* at Part I, 199 n. 114, 206 n. 160, Part II, 158 n. 17, 172–173 n. 21) which later appeared as Lacy, *Land Sale Contracts in Bankruptcy*, 21 UCLA L.Rev. 477 (1973). *See also*, Note, *Bankruptcy and the Land Sale Contract*, 23 Case Western Res.L.Rev. 393 (1972).

Strikingly absent from § 365 is any protection for a buyer not in possession, much less for the holder of an option to purchase. Rejection of such contractual commitments therefore comes within the general sweep of § 365. This seems clear from the statute. Moreover, it is a rule of statutory construction that if Congress intends to change an established judicial doctrine, it should make that intent specific. *Midlantic Nat'l Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986). It was well established under the prior Bankruptcy Act that the estate could reject a contract to sell real estate where

the buyer was not in possession. The buyer's right to specific performance, and the doctrine of equitable ownership flowing therefrom, were considered subordinate to the estate's right of rejection. *Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257 (1st Cir.1963); *In re Philadelphia Penn. Worsted Co.,* 278 F.2d 661 (3d Cir.1960); *In re New York Investors Mutual Group, Inc.,* 143 F.Supp. 51 (S.D.N.Y.1956). The doctrine of equitable ownership is a relic of the days when promises of contracting parties were considered independent of each other. W. Jaeger, *Williston on Contracts* § 927 (3d ed. 1963). As pointed out by Williston, it clouds analysis. *Id.* at § 929. Indeed, where the buyer has paid most or all of the purchase price, recognition of the doctrine and allowance of specific performance against a debtor in bankruptcy proceedings would be to prefer one creditor over others. *National Bank of Kentucky v. Louisville Trust Co.,* 67 F.2d 97, 100 (6th Cir.1933), *cert. denied* 291 U.S. 665, 54 S.Ct. 440, 78 L.Ed. 1056 (1934).

Thus the Debtor could reject its obligation to Santa Fe even if Santa Fe otherwise now had the right of specific performance through an election to purchase. This is confirmed by § 101(4)(B) which defines "claim" to include a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment ..." The legislative history indicates that this definition "is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy." 124 Cong. Rec.H. 11089 (Sept. 28, 1978). *See also Ohio v. Kovacs,* 469 U.S. 274, 279–81, 105 S.Ct. 705, 707–08, 83 L.Ed.2d 649 (1985) ("claim" in bankruptcy includes a mandatory clean-up injunction in favor of the state under environmental laws, parties and court assuming that any breach of a private contract gives rise to a claim). Subordination of the right of specific performance to a debtor's rejection rights is also manifest in § 365(n), where the licensee of

intellectual property is expressly denied specific performance. I must therefore respectfully disagree with the decision in *In re Lewis,* 94 B.R. 789, 795 (Bankr.D.Mass. 1988) holding that a contract for the sale of real estate is not executory because of the right of specific performance. *Roxse Homes, Inc. v. Roxse Homes LTD. Partnership,* 83 B.R. 185, 187 (D.Mass.1988), relied upon by *In re Lewis,* is distinguishable in that it involved a state court judgment ordering specific performance, which the court regarded as terminating the executory aspect of the parties' purchase and sale agreement.

## II. PERMISSIBILITY OF REJECTION IN THESE CIRCUMSTANCES

■ Under the prior Bankruptcy Act, the decision of an estate representative to reject an executory contract or unexpired lease was essentially left to his business judgment of what was in the best interests of the estate; he was not limited to rejecting only burdensome contracts or leases. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943); *In re Minges,* 602 F.2d 38 (2d Cir.1979); *Matter of Tilco, Inc.,* 558 F.2d 1369, 1372 (10th Cir.1977); *King v. Baer,* 482 F.2d 552, 557 (10th Cir.1973), *cert. denied* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973). The court of appeals for this circuit has referred to the decision on rejection as within the "discretion" of the estate representative. *Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257, 260 (1st Cir.1963). A different standard, however, was fashioned for rejection of collective bargaining agreements; here the courts required a balancing of the equities between employer and employees, or a showing that the contract was burdensome. *See NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523–26, 104 S.Ct. 1188, 1194–96, 79 L.Ed.2d 482 (1984); *Brotherhood of Railway, ETC. v. REA Express, Inc.,* 523 F.2d 164 (2d Cir. 1975); *Shopman's Union No. 455, ETC. v. Kevin Steel Products, Inc.,* 519 F.2d 698, 707 (2d Cir.1975). Congress approved a balancing of the equities approach for labor

contracts in enacting § 1113 of the present Code. And subsections (h), (i) and (n) of § 365 recognize the property interests and equities of lessees, timeshare owners, buyers in possession and licensees of intellectual property, which had troubled the writers and courts. But Congress has given no indication that the business judgment rule is not to continue to apply generally under the present Code. I therefore consider *Collazo* to be binding precedent on the question in this circuit, particularly because it dealt with the very issue involved here, rejection of an agreement for the sale of real estate. Indeed, there may be merit in the view that the very concept of rejection is unnecessary because a debtor's failure to assume an executory contract is like his failure to pay in full the typical claim of a party who has fully performed, and to require special standards for rejection favors a creditor who has partly performed over those who have fully performed. *See* Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845, 898–99 (1988).

Santa Fe argues, however, that a balancing of the equities test should be employed, relying upon the unpublished decision of Judge Wolf of this district in *Infosystems Technology, Inc. v. Logical Software, Inc.*, No. 87–0042, 1987 WL 13805 (D.Mass. June 25, 1987). But an unpublished decision of the district court should have no precedential value in this court in view of the First Circuit rule prohibiting the citation of unpublished opinions except in related cases. *See* Rule 36.2(b), F.R.A.P. of the First Circuit. *Infosystems*, moreover, involved an attempted rejection of interests in intellectual property for which the non-debtor party was paying royalties. In adopting a balancing of the equities standard, Judge Wolf relied in part upon *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561, 563 (Bankr.W.D.Wash.1983) which refused to permit rejection of an inventions license because rejection would ruin the business of the licensee. Judge Wolf declined to follow *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1048 (4th Cir.1985) which permitted rejection of a technology license agreement by its licensor. Congress has subsequently added subsection (n) to § 365 in order to recognize the property interests of licensees of intellectual property, effectively overruling *Lubrizol*. As discussed, property interest considerations have no application here. Hence *Infosystems* is of no aid to Santa Fe, even if it had precedential value.

It is nevertheless true that a balancing of the equities standard has crept into the case law under the Code. Strangely, a prime source of this is a decision which actually applied the business judgment standard. In *Robertson v. Pierce (In re Chi–Feng Huang*, 23 B.R. 798 (Bankr. 9th Cir.1982), the debtors sought to reject a contract for the sale of their apartment house. The buyer contended that the debtors themselves and not their creditors would benefit from the rejection, asserting that the debtors were solvent. The court adopted the business judgment standard, and in doing so it required only that unsecured creditors benefit from rejection. This is consistent with the business judgment standard as previously developed. *See, e.g., In re Minges*, 602 F.2d 38, 39, 44 (2d Cir.1979) (remanding to bankruptcy judge for determination that unsecured creditors rather than secured creditors would derive significant benefit from rejection). Unfortunately, however, the appellate panel described the process of determining whether unsecured creditors would benefit as one of "balancing of interests" between the damage to the non-debtor party and the benefit to the estate. *Chi–Feng Huang*, 23 B.R. at 801. This is unnecessary gloss on *Minges*, the decision which the panel primarily relied upon. That gloss and the labor contract cases have led some courts to require that the benefit to the estate and its unsecured creditors outweigh the damage to the non-debtor party. *See, e.g., In re Midwest Polychem, LTD.*, 61 B.R. 559, 562 (Bankr.N.D.Ill.1986); *In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr.S. D.N.Y.1985). Still, the weight of authority under the Code applies the business judgment standard in preference either to a balancing of the equities approach or one

requiring a showing that performance of the contract is burdensome to the debtor. *See In re Stable Mews Associates, Inc.,* 41 B.R. 594, 596 (Bankr.S.D.N.Y.1984) and cases collected therein.

Rejection of Santa Fe's option complies with the business judgment standard. The benefit to the estate is obvious. The pending sale is vital to the plan of reorganization of these affiliated debtors. They have had great difficulty in liquidating their properties because of the depressed New England real estate market. They must generate sufficient cash to fund a plan, and they are under pressure from creditors to file a plan soon. If one is not filed shortly, the court will be faced with the demands of numerous secured creditors for permission to foreclose. This pending sale may well be the linchpin of the entire reorganization.

I would also permit rejection if the standard for rejection required a balancing of the equities. The equities claimed by Santa Fe are much less than those favoring rejection. Santa Fe wishes to retain the right to exercise an option designed to give the Debtor extra incentive to construct improvements that Santa Fe's predecessor hoped in 1987 would enhance the value of its nearby property. That may or may not have been the effect of development of the property in 1987. If it was, conditions may change by 1991; the area may be generally developed by then in any event. Even exercise of the option by Santa Fe does not guaranty that construction will take place upon this property. Moreover, Santa Fe retains the right to approve plans for any new construction on the property.

These findings and conclusions are issued in support of the court's order of November 20, 1989 permitting rejection and declaring Santa Fe's claim to be unenforceable against the property or any buyer.