In re Barton **FLEISHMAN, Debtor.**

In re Gerald B. **OTTINGER, Debtor.**

**Bankruptcy Nos. 91–13707–
JNG, 91–13708–JNG.**

United States Bankruptcy Court,
E.D. Massachusetts.

April 8, 1992.

Daniel M. Glosband, Goodwin, Procter &
Hoar, Boston, Mass., for objecting party.

William G. Billingham, Marshfield,
Mass., Chapter 7 Trustee.

Gary W. Cruickshank, Boston, Mass., for
debtor.

Susan Kenneally, Boston, Mass., Office
of U.S. Trustee.

Robert J. Capozzi, Fitch, Wiley, Richlin & Tourse, P.C., Boston, Mass., for Resolution Trust Corp.

Bruce N. Elliott, Carlin, McKenney & Philbrick, P.C., Ann Arbor, Mich., for Richard L. Levine, Hill & Barlow, Boston, Mass., for Travis B. Jacobs Trust.

Andrew D. Epstein, Barker & Epstein, Boston, Mass., for Empire Management Corp. Money Market Associates.

Arthur D. Smith, Vineyard Haven, Mass., for Edgartown Nat. Bank.

Edward W. Vincent, Edgartown, Mass., for Island Ins. Agency.

Paul P. Daley, Hale & Dorr, Boston, Mass., for Thomas J. Healey.

## MEMORANDUM

JAMES A. GOODMAN, Bankruptcy Judge.

### A. PROCEDURAL HISTORY

The issue before the Court is whether a Right of First Refusal contained in a deed to property owned by Barton Fleishman and Gerald B. Ottinger and sold at public auction is a covenant running with the land or an executory contract that may be rejected by the Chapter 7 Trustee pursuant to § 365 of the Bankruptcy Code (the "Code"). The outcome of the Court's decision shall determine whether the property may be conveyed to the high bidder at the auction sale or whether the holder of the Right of First Refusal is entitled to the property upon payment of the amount of the high bid at the auction sale.

### B. FACTS

The material facts are undisputed. In 1954, the Jacobs family purchased the property located on Chappaquiddick Island, Edgartown, Massachusetts known as Green Pastures. Beginning in 1970, the Jacobs subdivided Green Pastures and sold several lots. In 1982, they formed an owners association, Green Pastures Association, Inc. ("GPA" or the "Association"). Travis Jacobs ("Jacobs") has been a director of GPA since its formation. At the time of its formation, GPA adopted and recorded a comprehensive Declaration of Restrictive Covenants (the "Declaration") designed to preserve the natural beauty of Green Pastures. The Declaration includes, among other things, rights to property owned in common for the benefit of GPA members, limitations on subdivision of lots, easements, and use restrictions. The Declaration also contains a provision prohibiting the sale of lots or buildings within Green Pastures unless a notice is first given to GPA, indicating the name of the prospective purchaser, describing the property to be sold, the price and terms of the sale offer, and offering the property for sale to GPA at the same price and on the same terms (the "Right of First Refusal"). The Declaration provides that GPA *must* accept or reject any such offer within 30 days of its mailing.

By deed, Jacobs conveyed a parcel of the land known as Lot No. 23 (the "Premises") to Gerald B. Ottinger and Barton Fleishman (the "Debtors") as joint tenants in 1988. The deed states that the Premises were conveyed subject to the Declaration.

On May 1, 1991, the Debtors each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. On June 4, 1991, they each filed notices of voluntary conversion to Chapter 7. William Billingham, Esq. was appointed the Chapter 7 Trustee (the "Trustee") in both cases.

In response to several motions for relief from the automatic stay through which secured parties sought permission from the Court to conduct foreclosure sales of the Premises, on October 17, 1991, the Trustee and secured creditors of the Debtors agreed that the Chapter 7 Trustee would conduct an "absolute auction" of the Premises. Thereafter, on October 29, 1991, the Trustee filed a notice of intended public sale free and clear of liens (the "Notice") and motion to sell the Premises free and clear of all liens (the "Motion to Sell"). The Notice, which was appended to the Motion to Sell, stated that:

> The terms and conditions of the sale are as follows: The sale will be by absolute auction conducted on the premises on

November 23, 1991, without reserve and without minimum bid and not subject to seller's or Debtors' confirmation. The property [the Premises] will be sold to the highest bidder, at the highest price, whatever that price might be.

The Notice also provided that objections, if any, to the Motion to Sell or the Notice had to be filed with this Court on or before November 14, 1991. Neither the Motion to Sell nor the Notice referred to the Right of First Refusal. Copies of the Motion to Sell and the Notice were served on GPA and all secured and unsecured creditors of the Debtors. No objections to the Notice were filed prior to the November 14, 1991 deadline. On December 10, 1991, the Court entered an order granting the Motion to Sell.

The auction was conducted at the Premises on November 23, 1991. No mention was made at the auction of the Right of First Refusal. Jacobs attended the auction, and though several bidders participated, Jacobs did not. Finally, Thomas J. Healey ("Healey") offered $1.22 million for the property, which offer was accepted. The Trustee informed GPA of the sale of the Premises by letter dated November 27, 1991.

On December 26, GPA assigned the Right of First Refusal to Jacobs and John E. Novak ("Novak"), an individual who is not a member of GPA. Jacobs and Novak informed the Trustee that they were exercising the Right of First Refusal to purchase the Premises for $1.22 million. Jacobs then asserted that he never expected or understood that the sale was intended to be free of GPA's Right of First Refusal, or of any other provisions of the Declaration. Jacobs further averred that the exercise of the Right of First Refusal could not occur until the sale price and terms were known and specified to GPA in the form of an offer to sell to GPA on such price and terms.

At a hearing held on January 6, 1992, the Chapter 7 Trustee and Healey, through a Joint Motion sought an order directing the Trustee to convey the Premises to Healey free and clear of the Right of First Refusal. Jacobs objected to the Joint Motion.

## C. DISCUSSION

Jacobs, on the one hand, contends the Right of First Refusal runs with the land, is valid under state law and is enforceable in bankruptcy. He further contends that the Trustee cannot extinguish the Right of First Refusal either by sale under § 363(f) or rejection under § 365 of the Code. The Trustee and Healey, on the other hand, argue that the Right of First Refusal does not touch and concern the land and does not, therefore, run with the land. They characterize the Right of First Refusal as an executory contract subject to rejection under § 365. In addition to these arguments, the Trustee maintains that, in essence, the auction was a sale by the mortgagees through the Trustee, and, since the Declaration itself excepts mortgagees' sales from the Right of First Refusal, the Right is not applicable to this sale. For the reasons discussed below, the Court finds that the arguments made by Healey and the Trustee are persuasive.

■■■■■ Under Massachusetts law a covenant or a restriction regarding real property is either a personal contractual obligation between the covenanting parties or a real covenant that runs with the land. *See Snow v. Van Dam*, 291 Mass. 477, 480, 197 N.E. 224 (1935). If a covenant does not run with the land by creating a burden upon or a benefit to the land, the covenant is merely a personal contractual obligation between the parties to the covenant. *Id.* (A restriction that does not "burden the supposed servient estate ... will be a mere personal contract on both sides."); *Bronson v. Coffin*, 108 Mass. 175, 181 (1871) (same).

In *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 90, 390 N.E.2d 243 (1979), the Massachusetts Supreme Judicial Court set out the requirements for a covenant to run with the land. Among other things, for a covenant to run with the land, the covenant must be in writing and signed by the covenantor; the parties must intend that the covenant run with the land; the parties

must be in privity of estate; the covenant must be recorded with the deed; and both the benefit and the burden of the covenant must touch and concern the affected parcels of land. *Id.* For a covenant to touch and concern land, it must confer a " 'direct physical advantage in the occupation of the dominant estate.' " *Id.* at 92, 390 N.E.2d 243, *quoting Norcross v. James,* 140 Mass. 188, 192, 2 N.E. 946 (1885). The covenant also must " 'make the use or occupation of [the dominant estate] more convenient.' " *Id.* In *Bronson v. Coffin,* the Massachusetts Supreme Judicial Court described a covenant that touches and concerns the land as follows:

> ... it has direct and immediate reference to the land; it relates to the mode of occupying and enjoying the land; it is beneficial to the owner as owner; and to no other person; it is in truth inherent in and attached to the land, and necessarily goes with the land into the hands of the heir or assignee.

108 Mass. at 183–84, *quoting Savage v. Mason,* 57 Mass. 500, 505 (1849).

The kinds of real covenants that Massachusetts courts have upheld are exemplified by a covenant to remove ice and snow from platforms and ramps, *Boston & Maine Railroad v. Construction Machinery Corp.,* 346 Mass. 513 (1963) (the covenants were enforced because the benefited and burdened land involved was devoted to railroad uses which need ice and snow-free platforms for traffic); a common scheme of building restrictions, *Snow v. Dam,* 291 Mass. 477, 197 N.E. 224 (1935) (the restrictions upheld prohibited commercial development in a tract of land devoted to ocean-front summer residences); and covenants prohibiting commercial use of a single-family house, *Brennan v. Kos,* 15 Mass.App. 513, 446 N.E.2d 1082, *appeal denied,* 389 Mass. 1102, 451 N.E.2d 1166 (1983) (properties in a subdivision contained restrictions allowing one-family houses only and prohibiting commercial use).

Massachusetts courts also have held that covenants not to compete may run with the land. In *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243 (1979),

Charles and Paul Kotseas ("Kotseas") granted land to Whitinsville Plaza, Inc. ("Plaza") that Plaza intended to develop into a shopping center. The deed to Plaza contained numerous restrictions and covenants designed to assure the harmonious development of the shopping center. *Id.* at 87, 390 N.E.2d 243. Specifically, Kotseas covenanted not to use the land retained in competition with a discount store that Plaza contemplated for the shopping center. *Id.* Contrary to the covenant, Kotseas leased the retained land to another discount store. *Id.* at 88, 390 N.E.2d 243. The court stated that Plaza established its business relying on this covenant restricting competing uses, and that Plaza's investment in the business would be diminished if the court did not enforce the restrictive covenant. *Id.* at 96–97, 390 N.E.2d 243. Accordingly, the Massachusetts court held that covenants not to compete run with the land and are enforceable by third parties "when they serve a purpose of facilitating orderly and harmonious development for commercial use." *Id.* at 97, 390 N.E.2d 243.

Unlike the covenants described above, the Right of First Refusal does not touch and concern the land. It does not confer a direct physical advantage to the occupation of the Premises, nor does it relate to the mode of occupying or enjoying the land or the ability to control development or commercial use. It cannot be interpreted to be inherent in or attached to the land. The Right of First Refusal only relates to the contractual right of GPA or its assigns to select its neighbors. Nor is it like a covenant not to compete, as it does not facilitate the orderly and harmonious development of commercial property. Therefore, the Court finds that the Right of First Refusal does not run with the land but is in the nature of a contractual agreement which affords the holder an opportunity to purchase land.

Jacobs argues that the Right of First Refusal is an integral part of a broad scheme of restrictions authorized in Massachusetts General Law, ch. 184, § 26 ("... it is to be presumed that a restriction imposed as part of a common scheme is en-

forceable...."), and that the Right of First Refusal, along with other covenants in the Declaration, promote the goals of the GPA to "prevent the erection of poorly constructed or designed structures" and to promote "an attractive, quality Community by requiring proper site development so as to achieve harmonious color schemes and attractive homes while at the same time maintaining and conserving the native vegetation—and natural beauty of the property." Relying upon *Snow v. Van Dam, supra,* and *Gulf Oil Corp. v. Fall River Housing Authority,* 364 Mass. 492, 306 N.E.2d 257 (1974), Jacobs maintains that severing this one right from the other rights embodied in the Declaration would abrogate the intent of the drafters of the Declaration, ruining the whole package.

Despite Jacobs' arguments to the contrary, the Court finds that the Right of First Refusal is not essential to the existence of the common scheme of development contemplated by the Declaration. With or without the Right of First Refusal, the Association will continue to retain its rights to maintain the common development scheme under the Declaration. The inability to control the identity of the owner of the Premises, which is the only right afforded by the Right of First Refusal, will not affect any other rights of the Association. As the Trustee argues, with or without the Right of First Refusal, the owner of the Premises will be subject to the restrictive covenants in the Declaration that do touch and concern the land, such as the restriction against commercial uses (Article VII) and the obligations concerning maintenance (Article XVIII). Though the cases that Jacobs cites concern common schemes, the schemes are comprised of land-use restrictions (restrictions on commercial use as well as size and cost of dwellings), not rights of first refusal. *See Gulf Oil,* 364 Mass. at 497–98, 306 N.E.2d 257, and *Snow,* 291 Mass. at 481, 197 N.E. 224. The Right of First Refusal is a separate contractual undertaking that can be severed from the other covenants contained in the Declaration. Indeed, the Declaration itself expressly acknowledges that one or more of the restrictions may be enforced and provides for the severance of such clauses without the invalidation of the entire set of restrictions. Article XIX, Section 4 states: "Invalidation of any one of the Protective Covenants by judgment or court order shall in no wise affect any other provisions which shall remain in full force and effect." (Article XIX, Section 4).

A New York court also has held that rights of first refusal do not run with the land as real covenants because they do not touch and concern the land. In *Clarke v. Caldwell,* 132 A.D.2d 171, 521 N.Y.S.2d 851 (3d Dept.1987), the court held that a right of first refusal contained in a deed was a personal covenant not binding on successors of the grantor and grantee. The right did not touch and concern the land because it "did not in purpose and effect substantially alter the legal rights of the covenantor in the land." *Id.* at 174, 521 N.Y.S.2d at 853.

In contrast, Jacobs cites *In re Coordinated Financial Planning Corp.,* 65 B.R. 711 (9th Cir.Bankr.App. Panel 1986), where a right of first refusal was found, under California law, to be a covenant running with the land which was enforceable against a covenantors' successor in interest (though the court found the covenant was an executory contract extinguishable under § 365, as discussed *infra* ). This case is distinguishable. In applying California Civil Code § 1468, the court found that all the requirements for covenants to run were met: 1) the land was particularly described; 2) the covenant specifically stated that assignees were bound; and 3) the memorandum of ownership agreement was recorded and incorporated by reference the covenant which gave constructive notice to all parties. Under the California statute, however, the common law touch and concern requirement was not necessary for the covenant to run. Massachusetts has no such statutory provision, just the common law requirements. *See Whitinsville Plaza v. Kotseas,* 378 Mass. at 90, 390 N.E.2d 243.

Having determined the Right of First Refusal is not a covenant that runs with the land, but a personal contract right between the parties, it is necessary to deter-

mine if that contract right is executory. Section 365 of the Code provides, with exceptions not relevant here, that "subject to the court's approval" a trustee in bankruptcy "may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Rejection generally constitutes a breach of the contract or lease. *Id.* at § 365(g).

The parties dispute whether the Right of First Refusal is an "executory contract" within the meaning of the statute. Probably the most comprehensive analysis of the term "executory contract" as used in the bankruptcy context is found in Professor Vern Countryman's two-part article appearing in 47 Minn.L.Rev. 436 (1973) and 58 Minn.L.Rev. 479 (1974). The definition of executory contract offered by Professor Countryman and adopted by many courts states: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." 57 Minn.L.Rev. at 460 (1973). *See In re A.J. Lane & Co., Inc.,* 107 B.R. 435, 436–37 (Bankr.D.Mass.1989) (a repurchase option contained in a recorded deed and retained by the vendor of the real property was an executory contract because "[a] material breach would occur should either party refuse to complete the transaction after exercise [of the option]").

GPA's right of First Refusal is set forth in the Declaration in Article XV, Section 2. In relevant part, it provides:

No Owner or representative of an Owner ... may sell ... any Lot, whether built upon or not, without first giving to the Association notice in writing, which notice shall contain (1) the specific description of the Lot or Lots he proposes to sell and the name of the proposed buyer, and (2) an offer to sell said Lot to the Association (or its designee) and the price and terms at which the Lot or Lots are offered. Within thirty (30) days after the date of mailing such offer to the Association, the Association *must* accept or reject the Owner's offer to sell. If the association does not accept the offer of the Owner within said 30–day limit, the Owner shall have the right during the ensuing six-month period to sell the Lot or Lots subject to the Declaration to the proposed buyer under conditions not more favorable to the buyers than those offered to the Association....

*Declaration* at Article XV, Section 2.

The Right of First Refusal requires both the seller of a lot and the GPA to act. The Debtor or Trustee must submit the name of the proposed purchaser in writing, a description of lot to be conveyed, and the price and terms of the sale; the GPA must within thirty (30) days either accept or reject the offer to sell. Under the Countryman definition, this Right of First Refusal falls squarely within the requirements of an executory contract subject to acceptance or rejection under section 365(a). *Accord In re A.J. Lane & Co., Inc.,* 107 B.R. at 437. In *Lane,* the court found a purchase option to be a unilateral contract until the option is exercised, and upon exercise it becomes a bilateral contract. The court stated: "It is the contingency of exercise which makes the option executory for our purposes. Upon exercise, substantial performance remains on both sides-conveyance of the property by the Debtor and payment of the purchase price by [the holder of the option]." *Id. See also In re Coordinated Financial Planning Corp.,* 65 B.R. at 713 ("The right of first refusal is an executory contract and is subject to rejection."); *In re Hardie,* 100 B.R. 284, 285–87, (Bankr. E.D.N.C.1989) (an unexercised purchase option constituted an executory contract subject to rejection under section 365(a)).

The fact that the Right of First Refusal is contained in an instrument of record (the Declaration), and the Declaration is referenced in the deed from Jacobs to the Debtors, does not change the fundamental contractual nature of the right of First Refusal and does not render the Right of First Refusal non-executory and, therefore, not subject to rejection under § 365. As Judge Queenan stated in *Lane*:

Santa Fe [the holder of an option to purchase] also argues that the Debtor seeks to disturb a property interest, em-

phasizing that the option is contained in a deed. But this does not make the option a property interest. It is only a contract right—the right to purchase—whose remedy is normally specific performance. That the world is given notice of this right though [sic] its appearance in a recorded deed prevents any other buyer from claiming the equities of an innocent third party, but that is all.

*Lane,* 107 B.R. at 438. *See also In re Coordinated Financial Planning Corp.,* 65 B.R. at 713 (though right of first refusal was found to be a covenant running with the land, enforceable against covenantors' successor in interest, the court determined the right was executory, and subject to rejection by the trustee).

Jacobs argues that *Lane* is not applicable to this case since the *Lane* court was not deciding the validity and enforceability of a right of first refusal under Massachusetts law, but under a California statute. There is no doubt that Massachusetts General Law ch. 184 recognizes that a common scheme of covenants is enforceable. However, the enforceability of a common scheme of covenants under state law does not prevent the rejection of one of the covenants if it is found to be nothing more than an executory contract within the constraints of § 365. By analogy, it is beyond cavil that a properly executed lease is enforceable at state law, yet § 365 provides for its rejection if it is found to be an executory contract.

■ There is no dispute that the Trustee did not accept or reject the Right of First Refusal within 60 days after the Debtors converted their cases to Chapter 7. It is also undisputed that the Trustee did not file a motion to extend the time to assume or reject the Right of First Refusal within 60 days after the conversion. Therefore, the Right of First Refusal was deemed rejected 60 days after June 4, 1991, the date the order converting the Debtors' cases became effective, pursuant to 11 U.S.C. § 365(d)(1). To the extent that the contract may not have ripened into a true executory contract until after the auction,

the Trustee's actions clearly evince an intention to reject the contract.

■ Finally, Jacobs argues that the Trustee could not sell the Premises free and clear of the Right of First Refusal unless the requirements of § 363(f) were met. Section 363(f) allows the trustee to sell property of the estate free and clear of any interest in such property if any one of five conditions are met (including consent of the interest holder). Jacobs' proposition is true only if the Right of First Refusal is an "interest" in the Premises existing on the date of the sale. It was not. *See In re A.J. Lane & Co., Inc.,* 107 B.R. at 438. *Cf. Kaiser Development Co. v. City and County of Honolulu,* 649 F.Supp. 926, 935 (D.Hawaii 1986), *aff'd,* 898 F.2d 112 (9th Cir.1990); *Spokane School District v. Parzybok,* 96 Wash.2d 95, 633 P.2d 1324 (1981); *City of Ashland v. Kittle,* 347 S.W.2d 522 (Ky.1961). The Right of First Refusal is thus not an interest in property but a contract right, a right deemed rejected 60 days after the Debtors' cases were converted to Chapter 7.

■ Section 502(g) of the Code states that: "[a] claim arising from the rejection, under § 365 of this title ... of an executory contract ... that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section ... the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C. § 502(g). Thus, the rejected contract is considered to have been breached immediately before the date the Debtors filed their petitions. Jacobs could then, conceivably, either claim money damages for the breach or equitable relief in specific performance.

Section 365(j) states that "... a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such party has paid." 11 U.S.C. § 365(j). If Jacobs had paid for the Right of First Refusal, or had paid for an option to purchase the property in the future for a stat-

648

ed price, he would have a lien for the consideration paid for that right, plus reasonable compensatory, consequential, and incidental damages as a result of its breach. *See In re Waldron,* 36 B.R. 633, 641–42 (Bankr.S.D.Fla.1984), *rev'd on other grounds,* 785 F.2d 936 (11th Cir.1986). That is not the case here, for there is no indication that any consideration was given for the Right of First Refusal, nor is Jacobs economically harmed in any way by his inability to exercise the Right. The Court agrees with Judge Queenan that the general sweep of § 365 offers little protection for buyers of real property not in possession, and much less for the holder of a right to purchase real property. 107 B.R. at 438.

■■■ Nor will Jacobs be able to enforce his contract right with the remedy of specific performance. Specific performance should not be permitted where the remedy would in effect do what § 365 meant to avoid, that is, impose burdensome contracts on the debtor. *Id.* at 439 (right of specific performance subordinate to debtor's rejection rights); *In re Waldron,* 36 B.R. at 642 n. 4 ("The Code does not permit specific performance as a remedy resulting from the rejection of an executory contract under § 365.") Accordingly, the Trustee is able to sell the Debtors' interests free and clear of the Right of First Refusal, and the Trustee's right to reject the Right of First Refusal takes precedence over any right to specific performance Jacobs may allege.

The Trustee also notes that there was an agreement between the parties that the Premises would be sold by absolute auction, without reserve, conducted by the Trustee, under the belief that a better price would be obtained than if the sale was permitted to go to foreclosure. The Trustee argues, that by this agreement, the sale should be considered a mortgagees' sale. He notes that Massachusetts General Law ch. 244, § 14, authorizes foreclosure under power of sale by "a person acting in the name of [the] mortgagee." The Declaration in Article XV, Section 2, excepts just such mortgagee sales from the Right of First Refusal. Therefore, the Trustee con-

cludes, and the Court tends to agree but does not so rule, that the Declaration itself prevents the application of the Right to this sale.

### D. CONCLUSION

The Right of First Refusal in this transaction does not run with the land; it is an executory contract that was deemed rejected. Since the resolution of these particular issues is dispositive, the other issues raised by Healey, including the effect of the assignment on the Right of First Refusal to Jacobs and Novak need not be addressed. The Trustee is hereby authorized to consummate the sale to Healey.

The foregoing constitutes findings of fact and rulings of law in accordance with the Federal Rule of Bankruptcy Procedure 7052. An appropriate order shall issue.

### ORDER

In accordance with the memorandum dated April 8, 1992, the Joint Motion of Trustee and Purchaser for an Order Directing the Trustee to Convey Real Property to Thomas J. Healey is allowed, and the objection to the Joint Motion filed by Travis B. Jacobs is overruled.